491 P.2d 1268

**Lyle G. PITNER, Plaintiff-Appellant,**

**v.**

**FEDERAL CROP INSURANCE CORPORA-
TION, Defendant-Respondent.**

**No. 10832.**

Supreme Court of Idaho.

Dec. 27, 1971.

Scott W. Reed, Coeur d'Alene, for plaintiff-appellant.

Sidney E. Smith, U. S. Atty., Boise, for defendant-respondent.

DONALDSON, Justice.

In the summer of 1968, plaintiff-appellant Lyle G. Pitner planted barley on certain acreage in Kootenai County, Idaho, and thus there was no summer fallow of this land. A substantial portion of this barley crop was lost before harvest. Pitner then planted winter wheat on the same land. The wheat crop was also almost completely destroyed by winterkill. As a result of this loss of the wheat crop, Pitner commenced this suit to recover insurance benefits under a policy issued by the Federal Crop Insurance Corporation (hereinafter referred to as FCIC).

The facts developed at trial are as follows. In October of 1968, Pitner was contacted by an agent of the FCIC regarding crop insurance, and he applied for crop insurance on the wheat in question. There is a conflict in the testimony as to what was said on that day. At the trial, Pitner testified that he told the FCIC agent that the wheat to be insured was to be grown on fields which had been planted with barley during the immediately preceding summer. The agent testified that he told Pitner that when winter wheat is to be insured, the land must lie fallow during the preceding summer; he further testified that Pitner told him that the land to be insured was coming out of the Soil Bank. Pitner's application for insurance was accepted by FCIC on November 4, 1968.

In the winter of 1968–69, snow fell in great depths, and as a result Pitner's wheat was destroyed by snow mold. On May 1, 1969, Pitner notified FCIC of the loss and stated his intention to resow to spring barley. An FCIC agent conducted an investigation, found that the crop was almost completely destroyed by winterkill, and advised Pitner not to replant but to harvest what he could and then make a claim based on the final loss.

On June 26, 1969, an agent from FCIC informed Pitner that his wheat crop was not insurable because there had been no summer fallow after the preceding barley crop. The summer-fallow requirement was contained in the county actuarial table for Kootenai County—a document incorporated by reference in the FCIC insurance policy issued on Pitner's wheat. It was the usual practice to show one of these tables to the customer while soliciting his application, and one was allegedly shown to Pitner at that time.

After advising Pitner that his wheat crop was not insured, the FCIC agent presented him with a revised "crop insurance acreage report," which Pitner signed. Pitner testified that he was told that the only reason he should sign this was so that he would not be held responsible for the premium which would otherwise be due under his insurance policy. This testimony was corroborated by that of his partner,

who was present at the time. But the agent testified:

"I made out a revised acreage report for him to sign and he didn't want to sign it because he said it would put him out of insurance for the year and I told him that apparently he didn't have any insurance anyway because it was continuous cropping, so he eventually signed the revised acreage report."

This report stated that zero acres of wheat were insured and that the wheat listed as insured on the original acreage report was "wheat after barley" and "not insurable."

After all the evidence was in, the trial court directed a verdict in favor of FCIC on the ground that the signing of the revised acreage report constituted a voluntary cancellation of the insurance coverage, the court stating: "The parties on June 26, 1969, voluntarily withdrew this wheat coverage under the policy and therefore there could be no insurance coverage and no recovery against the Federal Crop Insurance Corporation * * *." Pitner appeals from the directed verdict and the resulting judgment in favor of FCIC.

Although the appellant assigns as error several actions taken by the trial court, the crucial question for determination on this appeal is whether the trial court erred in directing a verdict for the Federal Crop Insurance Corporation on the ground that the execution of the revised acreage report constituted an agreement between the parties to cancel insurance coverage on the wheat which had been lost.

■ Relying on certain provisions governing *unilateral* cancellation, appellant contends that the alleged cancellation in this case was prohibited by the FCIC insurance policy issued to Pitner. Section 13(a) of the Federal Crop Insurance Policy (plaintiff's exhibit number 11) provides in pertinent part: "Insurance on any insured crop may not be canceled for the first crop year but thereafter *either party* may cancel insurance on any insured crop * * *." Emphasis added. This language indicates that the procedure set out

in this section governs only *unilateral* cancellations. The cancellation alleged to have occurred in this case was one by mutual agreement—a *bilateral* contract modifying the parties' former insurance policy contract. Unquestionably, insurance coverage may be canceled by mutual consent of the contracting parties notwithstanding a provision in the policy specifying a method of cancellation. Prillaman v. Century Indemnity Co., 138 F.2d 821 (4th Cir. 1943); Continental Casualty Co. v. Giller Concrete Co., 116 F.2d 431 (5th Cir. 1940), cert. denied, 313 U.S. 567, 61 S.Ct. 941, 85 L.Ed. 1525 (1941); Shunga Plaza, Inc. v. American Employers' Ins. Co., 204 Kan. 790, 465 P.2d 987 (1970), vacated on other grounds, 206 Kan. 16, 476 P.2d 642 (1970); Dill v. Lumbermen's Mut. Ins. Co., 213 S.C. 593, 50 S.E.2d 923 (1948); Blomquist v. Grays Harbor County Medical Serv. Corp., 48 Wash.2d 718, 296 P.2d 319 (1956); 45 C.J.S. Insurance § 444 (1946); Annot., 152 A.L.R. 95 (1944). An insurance policy may be rescinded by mutual consent even after a loss purportedly insured against has occurred. Peterson v. New York Life Ins. Co., 185 Minn. 208, 240 N.W. 659 (1932); Klanian v. New York Life Ins. Co., 68 R.I. 126, 26 A.2d 608 (1942); Fox v. Bankers Life & Casualty Co., 61 Wash.2d 636, 379 P.2d 724 (1963); Annot., 80 A.L.R. 185 (1932).

■ A cancellation of insurance coverage by mutual agreement is a contract which must be formed like any other contract. A necessary element in the formation of a valid bilateral contract of cancellation is mutual assent. Fox v. Bankers Life & Casualty Co., *supra*; 45 C.J.S. Insurance § 444 (1946). Such assent is vitiated where it is procured by fraud or given under a mistake of material fact. In determining the legal effect of an alleged cancellation agreement, recent cases have held that a factual issue is raised where it is not clear that the insurer was entitled to rescission—i.e., where it is not clear that the loss incurred was not covered by the policy issued by the insurer. In Kilty v. Mutual of Omaha Ins. Co., 287 Minn. 403,

178 N.W.2d 734 (1970), the Supreme Court of Minnesota held that where there is insufficient evidence to entitle the insurer to a rescission as a matter of law, a factual issue is raised:

"Defendant's contention on appeal is that it is entitled to judgment on any interpretation of the evidence because plaintiff accepted and cashed the check defendant tendered as a refund of all unearned premiums paid under the policy. Defendant asserts that this conduct constituted consent to rescission of the policy as a matter of law under Peterson v. New York Life Ins. Co., 185 Minn. 208, 240 N.W. 659. The Peterson case did not involve the issue of bad faith or fraud on the part of the insurer in procuring consent to the rescission. In that case, there was compelling evidence of misrepresentation on the part of the insured in her application for insurance. There is no clear evidence of misrepresentation in the application for insurance in this case, of fraudulent concealment of medical history relevant to the application, nor of justifiable reliance by the insurer upon any such alleged misrepresentation. We must interpret the verdict in plaintiff's favor as a finding of no misrepresentation in the application for insurance which would bar recovery under the policy.

"Where there is insufficient evidence of misrepresentation in an application for insurance to entitle the insurer to rescission, a factual question is raised as to whether an alleged rescission by consent is voidable because obtained through bad faith or fraud on the part of the insurer." 178 N.W.2d at 736.

In Fox v. Bankers Life & Casualty Co., *supra*, the Supreme Court of Washington, after holding that the question of full disclosure had properly been submitted to the jury, which found that there had been no material misrepresentations on the part of the insured, proceeded as follows:

"The defendant contends also that the action cannot be maintained because there was an agreed cancellation of the policy. The evidence showed, however, that there was no agreement of the parties, but the cancellation was the unilateral act of the defendant, which sent its agent to see Mr. Fox with a release form and a check for premiums paid. The agent told him that the policy had been canceled because of the inaccuracy of the medical history. This was after Mr. Fox had submitted his claim. His rights under the policy had matured, but he was ignorant of the fact and signed the rescission. He did not cash the check which was left with him but consulted an attorney, and this action followed almost immediately thereafter.

"As the rule is stated in 45 C.J.S. Insurance § 444b, p. 70, to effect a cancellation of an insurance policy by mutual consent there must be a meeting of the minds, or mutual assent, and each party must act with knowledge of the material facts. Here, there was no attempt to reach a mutual understanding, but the cancellation was presented to Mr. Fox as an accomplished act. This cancellation was not according to the contract or statutory authority, and the trial court correctly held that it did not constitute a defence to the action." 379 P.2d at 726.

These cases stand for the proposition that the question of whether a rescission by consent has been effected is one of law for the court only where the facts are admitted or clearly established—including the fact that there was no insurance coverage at the time of the alleged cancellation.

In the case at bar, the FCIC claims that Pitner's signature on the revised crop acreage report indicates his assent to a proposal to cancel insurance coverage on the wheat he had lost. The FCIC agent who presented Pitner with this form told him that he did not have any insurance on his wheat; if his wheat was, in fact, insured, then the cancellation agreement was not binding, because it was entered into upon a misrepresentation of a material fact. Therefore, it was necessary to deter-

mine at trial whether the wheat was insured at the time of the alleged cancellation. If it was insured, then the alleged cancellation agreement is of no force and effect; but if it was not insured, then it is binding, and Pitner is not liable for the premium thereby released.

Since we have decided that it is necessary to determine at trial whether the wheat was insured at the time of the alleged cancellation of insurance, it is also necessary for us to determine at this time whether the federal government can be bound by the actions of its agent in this case, in the event that the jury were to believe Pitner's version of the events which took place on the day he was contacted by the FCIC agent who took his application for insurance. On this issue both the appellant and the respondent discuss the case of Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), which has been cited in many subsequent cases for the proposition that the doctrines of apparent authority and estoppel are not applicable to the government of the United States. In the *Merrill* case, two brothers, one of them a lawyer (who argued the case before the Supreme Court of the United States), applied for crop insurance, making full disclosure that the wheat to be insured was reseeded. The application was processed by the Bonneville County (Idaho) Agricultural Conservation Committee, acting as local agent for the FCIC. The Merrills were advised by the County Committee that their entire crop was insurable, and the formal application for insurance, which did not mention the reseeding, was sent to the Denver office of the FCIC and was duly accepted. Most of the crop was destroyed by drought, and the Merrills sought recovery under their policy, which was resisted by the FCIC on the ground that Wheat Crop Insurance Regulations published in the Federal Register precluded insurance coverage for reseeded wheat. Although the FCIC had authority to insure reseeded wheat, it had determined as a matter of policy not to insure it and had published a regulatiðn in the Federal Register to that effect. Neither the Merrills nor the County Committee had actual knowledge of the regulation. The Supreme Court of Idaho, Merrill v. Federal Crop Insurance Corporation, 67 Idaho 196, 174 P.2d 834, held that the Merrills "purchased the insurance in question in good faith and thereafter suffered a loss. The [FCIC] through its agent had knowledge of the material facts. It is now estopped from denying the validity of the insurance contract." The premise for the decision was that since the knowledge of an agent of a private insurance company, under the facts presented, would be attributed to and bind a private insurance company, the FCIC was equally bound. In a 5–4 decision, the Supreme Court of the United States reversed. Proceeding from the assumption that the Merrills could have recovered against a private insurance company, the majority stated two fundamental propositions: (1) "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority";[1] and (2) "Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."[2] Mr. Justice Jackson, joined by Mr. Justice Douglas, said in dissent that "one should not be expected to have to employ a lawyer to see whether his own Government is issuing him a policy which in case of loss would turn out to be no policy at all * * *. I should respond * * * by laying down a federal rule that would hold these agencies to the same fundamental principles of fair dealing that have been found essential in progressive states to prevent insurance from being an investment in disappointment."[3]

1. 332 U.S. at 384, 68 S.Ct. at 3.
2. 332 U.S. at 385, 68 S.Ct. at 3.
3. 332 U.S. at 387–388, 68 S.Ct. at 5.

In the case at bar, the FCIC does not contend that regulations published in the Federal Register preclude recovery; rather, it relies upon a restriction contained in the "county actuarial table." Although this document was incorporated by reference in the policy issued to Pitner by the FCIC, it did not have the force and effect of law, since it was not published in the Federal Register. Thomas v. County Office Committee of Cameron County, 327 F.Supp. 1244 (S.D.Texas 1971); Graham v. Lawrimore, 185 F.Supp. 761 (E.D.S.C. 1960), aff'd 287 F.2d 207 (4th Cir. 1961); United States v. Morelock, 124 F.Supp. 932 (D.Md.1954). To the extent that the *Merrill* majority relied upon publication of the limitation in the Federal Register, therefore, that case is distinguishable from this one. Moreover, we doubt the continuing validity of *Merrill's* broad exemption of governmental agencies from the generally prevailing principles of agency law and fundamental fairness. From the day the *Merrill* case was handed down, it has been the subject of considerable criticism.[4] Although the case has been followed consistently, many courts have done so only grudgingly,[5] and never (not even in *Merrill* or in the cases relied upon therein) has it been explained why government corporations which act through agents are not subject to the same law of principal and agent that applies to other principals. It has been suggested that the reason behind the special rule is that a government agent should not be able to expand the power delegated to his department by Congress.[6] As one writer has put it:

"Unlike the case involving only an ordinary principal and agent, there is more than mere private interests at stake when the administration acts through its agents. In such cases, the entire community has a vital concern in ensuring that administrative agents do not act beyond the bounds of the actual authority delegated to them by law. If such agents can bind the administration by their acts, even though such acts are not clearly within the scope of their authority, there is danger that they will assume powers not actually delegated to them, knowing that their governmental principal will not be able to disavow even such acts. The doctrine of estoppel could thus be used to give *de facto* validity to *ultra vires* administrative acts. This, at any rate, appears to be the fear that has induced the courts on both sides of the Atlantic to refuse to bind the administration by the advice or assurances given by its agents."[7]

The reason for the rule does not, however, justify its application here; for in this case it was not a statute, but an administrative policy, which was allegedly violated by the action of the government agent. The action allegedly taken (the insuring of wheat grown on land which had not been summer-fallowed) was within the statutory authority delegated to the FCIC by Congress.[8] In such a situation, the peril which has induced the rule does not appear to exist; as it was said by the author quoted above:

"Where it is the administrative agency's own regulation, rather than a statute,

4. *See, e. g.,* 2 K. Davis, Administrative Law Treatise § 17.01 et seq. (1958); Schwartz, Estoppel and Crown Privilege in English Administrative Law, 55 Mich. L.Rev. 27–38 (1956); Whelan and Dunigan, Government Contracts: Apparent Authority and Estoppel, 55 Geo.L.J. 830–849 (1967); 27 Texas L.Rev. 84 (1948); 16 U.Chi.L.Rev. 128–138 (1948).

5. *See, e. g.,* McFarlin v. Federal Crop Insurance Corporation, 438 F.2d 1237 (9th Cir. 1971) (per curiam).

6. Schwartz, *supra,* note 4, at 35–37; Whelan and Dunigan, *supra,* note 4, at 847–849.

7. Schwartz, *supra,* note 4, at 35.

8. In fact, beginning with 1970 wheat and barley crops in Kootenai County, Idaho, insurance coverage was available from the FCIC for *two* years after an actual summer-fallow operation. Plaintiff's exhibit 16.

that limits the agent's authority, there is no danger that the working of an estoppel will enable the administration to extend its own statutory authority. It is true that, in the normal case, an administrative organ should be bound by its own rules and regulations, whose terms should be adhered to in every case to which they are applicable. That principle should, however, give way in order to prevent injustice to one whom an administrative official has led to rely upon advice or assurance to his detriment. In such a case, there is no real public interest to justify refusing to estop the administration from denying the correctness of the advice or assurance given."[9]

■ It is a generally accepted principle that an agent of the federal government can bind the United States to any agreement he is actually authorized to make. *See* United States v. Georgia-Pacific Co., 421 F.2d 92 (9th Cir. 1970), and authorities cited therein. We believe that an agent of the federal government should also be able to bind the United States to any agreement which Congress has empowered his department or agency to make, even where he is not actually authorized to do so, the binding effect being derived on the basis of apparent authority or estoppel as normally applied to agents of private parties.[10] In a recent case,[11] the Ninth Circuit Court of Appeals concluded that the doctrine of collateral estoppel could properly be applied even though the action relied upon by the injured parties was unauthorized:

"Unfortunately for appellants, the promise that loss of priority would not result was unauthorized by statute, regulation, or decision. The Secretary attached no weight to the unauthorized promise other than to term it regrettable and decided that he could not be bound or collaterally estopped by the fact that the land office

decision gave misinformation to appellants. Not every form of official misinformation will be considered sufficient to estop the government. See 2 K. Davis, Administrative Law Treatise Section 17.01 et seq. Yet some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement. Cases where the Secretary of the Interior has been held collaterally estopped from disavowing offical [sic] advice include: Seaton v. Texas Co., 103 U.S.App.D.C. 163, 256 F.2d 718; Chapman v. El Paso Natural Gas Co., 92 U.S.App.D.C. 154, 204 F.2d 46. See also McKay v. Wahlenmaier, 96 U.S.App.D.C. 313, 226 F.2d 35. We conclude that the collateral estoppel doctrine can properly be applied in this situation where the erroneous advice was in the form of a crucial misstatement in an official decision. The Secretary was understandably concerned that the estoppel doctrine can have a deleterious effect on administrative regularity. However, administrative regularity must sometimes yield to basic notions of fairness."[12]

■ In the case at bar, if the jury were to believe Pitner's version of the events which took place on the day he was contacted by the FCIC agent (i.e., that he told the agent that the wheat to be insured was planted on land which had been planted with barley during the preceding summer, and that the agent told him the wheat was insurable), then the agent's knowledge should be attributed to the FCIC, and the FCIC should be estopped to deny insurance coverage. If there was, in fact, insurance coverage at the time of the purported cancellation agreement, then that agreement is voidable (as explained above), since it was made with the understanding that the wheat loss was uninsured.

9. Schwartz, *supra*, note 4, at 36–37.

10. This solution to the problem was suggested by Whelan and Dunigan, *supra*, note 4, at 848.

11. Brandt v. Hickel, 427 F.2d 53 (9th Cir. 1970).

12. Id. at 56–57; *see also* United States v. Lazy F C Ranch, 324 F.Supp. 698. (D.Idaho 1971).

In the event Pitner were to prevail on the merits in this case, he would not, as he contends, be entitled to collect attorney's fees from the FCIC. As the respondent correctly points out, 28 U.S.C. § 2412 provides, in pertinent part:

"Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title *but not including the fees and expenses of attorneys* may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity, in any court having jurisdiction of such action." Emphasis added.

*See* Cassata v. Federal Savings and Loan Insurance Corp., 445 F.2d 122 (7th Cir. 1971) (holding that § 2412 precludes the assessment of attorney's fees against the FSLIC).

Appellant also contends that he was entitled to a directed verdict against the FCIC. A motion for a directed verdict admits the truth of the adversary's evidence and every inference that may legiti-mately be drawn therefrom. Curtis v. Dewey, 93 Idaho 847, 475 P.2d 808 (1970); Bratton v. Slininger, 93 Idaho 248, 460 P. 2d 383 (1969). When the record is evaluated according to this standard, it is clear that Pitner was not entitled to a directed verdict in his favor.

As initially pointed out in this opinion, the trial court directed a verdict in favor of the FCIC on the ground that the parties had voluntarily canceled insurance coverage after a loss had occurred. We have held here that this was error because no determination was made as to whether the wheat lost was insured at the time of the alleged cancellation. Certain conflicts in the testimony must be resolved by a jury before such a determination can be made. Therefore, this case is remanded to the district court for a new trial to be conducted in a manner consistent with the views expressed herein.

Reversed and remanded for a new trial. Costs to appellants.

McQUADE, C. J., McFADDEN and SHEPARD, JJ., and HAGAN, District Judge, concur.