No. 13850

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

NATIONAL INDEMNITY COMPANY,

Plaintiff and Appellant,

-vs-

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, a corporation,

Defendant and Respondent.

---

Appeal from:  District Court of the Eighteenth Judicial District,
              Honorable W. W. Lessley, Judge  presiding.

Counsel of Record:

For Appellant:

    Anderson, Symmes, Brown, Gerbase, Cebull and Jones,
     Billings, Montana
    James L. Jones argued, Billings, Montana

For Respondent:

    Alexander, Kuenning, Miller and Ugrin, Great Falls,
     Montana
    Neil Ugrin argued, Great Falls, Montana

---

Submitted:  March 7, 1978

Decided: **MAR 2 9 1978**

Filed: **MAR 2 1978**

Thomas J. Kearney
                                Clerk

Mr. Justice John C. Harrison delivered the Opinion of the Court.

Plaintiff National Indemnity Company brought this action against defendant St. Paul Fire & Marine Insurance Company for a declaratory judgment holding defendant liable for an insurance loss arising out of an accident at the Montana State University Field House. The District Court, Gallatin County, found plaintiff liable for the loss. Plaintiff appeals.

The 1972 Montana Constitution, effective July 1, 1973, abolished the doctrine of sovereign immunity in Montana. In response, the Montana legislature passed the Montana Tort Claims Act, providing for the purchase by the State of a statewide comprehensive liability policy to be effective July 1, 1973. National Indemnity was awarded the bid June 25, 1973, and a binder was issued June 27, 1973.

For a number of years, Waite & Co., a Bozeman insurance agency, represented MSU in insurance matters through its agent, Don Ferron. In January, 1973, MSU maintained two liability policies through Waite & Co.; a broad liability policy with Safeco Insurance Company and a specific liability policy covering the Field House with St. Paul.

In April, 1973, two officers of MSU, business manager Tom Nopper and assistant treasurer Lee Nelson, became aware of the impending statewide comprehensive liability plan. As they were uncertain of the extent of the coverage, they contacted Ferron and requested that he cancel, effective July 1, 1973, any St. Paul or Safeco coverage that would be duplicated under the new plan. The concerns of the MSU officials were two-fold: to avoid duplicate coverage which would be accompanied by duplicate premiums, and to avoid gaps in coverage should the St. Paul policy cover risks not covered by the new plan. Ferron, however, was unable to make the comparison because the National Indemnity

policy was not yet available. Thereafter, Nopper, Nelson, and Ferron entered into an oral agreement which is the subject of this dispute. Generally speaking, the parties agreed to cancel, effective July 1, 1973, any portions of the St. Paul policy which duplicated the coverage under the new plan. When the National Indemnity policy became available at some later date, a determination could be made of the areas of duplication and any excess premium paid would be refunded to MSU. St. Paul's coverage would extend to all risks not covered by the new policy, until its expiration in 1974. There is no dispute that Ferron was the agent for St. Paul and as such had the authority to bind St. Paul with respect to the cancellation agreement.

MSU did not receive a copy of the new National Indemnity policy until August 28, 1973. Shortly thereafter, a copy of the policy was delivered to Ferron.

On October 23, 1973, Douglas Reeves, an MSU student, was electrocuted while taking a whirlpool bath in the Field House. Soon thereafter, Nopper notified Ferron of the accident. Ferron advised Nopper to report the accident to the National Indemnity adjusters. Ferron, in turn, notified St. Paul of the death.

On November 29, 1973, Ferron prepared a "Lost Policy Certificate and Release" on the St. Paul policy, with July 1, 1973 as the "effective date of cancellation", and personally delivered it to Nelson at MSU for his signature. Nelson immediately signed the certificate and release.

Following an investigation of the death, on or about March 18, 1974, a $125,000 settlement was reached between the Reeves family and National Indemnity. The agreement, containing a covenant not to sue, was formally executed May 22, 1974.

National Indemnity first learned of the existence of the St. Paul policy in April, 1974. It was discovered that the St.

- 3 -

Paul policy provided for primary insurance on the Field House up to a policy limit of $1,000,000, while the National Indemnity policy covered, in the case of duplicate insurance, the excess only. After learning of the cancellation, National Indemnity requested that St. Paul participate in the loss. St. Paul refused, precipitating the instant action for a declaratory judgment.

The case was submitted to the District Court on stipulated facts and depositions. The court found, in pertinent part:

"FINDING OF FACT NO. 9

"That prior to July 1, 1973, acting upon a request by MSU, St. Paul (and Safeco) acting through Ferron, entered into an agreement with MSU which would terminate coverage effective July 1, 1973 on any areas that would duplicate the National Indemnity coverage."

"CONCLUSIONS OF LAW

"I.

"That the coverage previously afforded by St. Paul on the MSU Field House was cancelled by mutual consent of the parties effective July 1, 1973 by an agreement made between MSU and St. Paul prior to July 1, 1973. See Dill v. Lumbermen's Mutual Ins. Co., 50 S.E.2d 923 (S.E. 1948); 45 CJS, Insurance, §444B, page 71.

" * * *

"III.

"Alternatively, it is held that the existing St. Paul policy was modified orally by the parties. R.C.M. 1947, §40-3717, even if otherwise applicable, is rendered meaningless by §40-3726, R.C.M. 1947, §49-105, R.C.M. 1947, §49-102, R.C.M. 1947."

The issues presented for review are: (1) whether the District Court erred in finding that the St. Paul policy had been cancelled by mutual agreement; and (2) whether the court erred in its alternative finding that the St. Paul policy had been effectively modified.

- 4 -

National Indemnity contends that the St. Paul policy covering the Field House had not been cancelled by the date of the accident, October 23, 1973, and that no cancellation occurred until November 29, 1973, when the "Lost Policy Certificate and Release" was signed. This they argue would not be an effective cancellation with respect to the claim in question since interests in insurance vest at the time of the loss. See 45 C.J.S. Insurance §444, p. 72; McLane v. Farmers Insurance Exchange, (1967), 150 Mont. 116, 432 P.2d 98.

St. Paul responds that there was a valid mutual agreement, prior to July 1, 1973, to cancel any duplicate policies and that such policies were effectively cancelled July 1, 1973. Therefore, the result in this case ultimately depends upon the effect of the oral agreement made by Ferron, representing St. Paul, and Nelson and Nopper, representing MSU, sometime prior to July 1, 1973.

In this State, a written contract may be cancelled by the mutual consent of the parties, and such cancellation may be made orally. Section 13-903, R.C.M. 1947; West River Equipment Co. v. Holzworth Construction Co., (1959), 134 Mont. 582, 587, 335 P.2d 298. While there appears to be no direct authority in Montana regarding the mutual cancellation of insurance policies, the rules are well established in other jurisdictions, as set forth in Dill v. Lumbermen's Mut. Ins. Co., (1948), 213 S.C. 593, 50 S.E.2d 923, 926:

> "Whether cancellation by mutual agreement
> has been effected depends on the intention
> of the parties as evidenced by their acts,
> conduct and words, taken in connection
> with the attendant circumstances. There
> must be a meeting of minds, or mutual
> assent, to constitute a valid cancellation,
> and each party must act with knowledge of
> the material facts. If both parties agree
> that a policy is to be cancelled, transactions
> with reference thereto are to be construed
> reasonably and fairly and in accordance

> with the evident understanding of the parties
> at the time. Incomplete negotiations looking
> toward a contract for cancellation do not
> effect cancellation. Interstate Life & Acci-
> dent Co. v. Jackson, 71 Ga.App. 85, 30 S.E.2d
> 208. And the burden of proving that there has
> been a cancellation of a policy rests on the
> party asserting it. 45 C.J.S., Insurance,
> §461, page 129. "

See also 45 C.J.S. Insurance §444, pp. 70-71; Gavin v. North

Carolina Mutual Insurance Co., (1975), 265 S.C. 206, 217 S.E.

2d 591, 596; Pitner v. Federal Crop Insurance Corporation, (1971),

94 Idaho 496, 491 P.2d 1268, 1271; Fox v. Bankers Life & Casualty

Co., (1963), 61 Wash.2d 636, 379 P.2d 724, 726.

What did the parties agree to prior to July 1, 1973?

National Indemnity characterizes the agreement as one to con-

tinue the St. Paul policies until such time as a determination

of the areas of duplicate coverage could be made. It is urged

that the situation was merely incomplete negotiations looking

toward a contract of cancellation and that the parties lacked know-

ledge of the material facts essential for a cancellation by

mutual agreement. In support of this theory, National Indem-

nity refers to various statements by Nelson, Nopper and Ferron

in their depositions. National Indemnity also points out the

existence of memoranda and letters from St. Paul's files in-

dicating that some of St. Paul's agents, at times subsequent

to the accident, did not consider the policy cancelled.

By reference to the same depositions of Nelson, Nopper

and Ferron, St. Paul argues that they mutually agreed that any

St. Paul policies duplicating the coverage of the National

Indemnity policy would be cancelled as of July 1, 1973. All

that remained to be accomplished after that date was the physical

determination of the areas of duplication, the signing of the

Lost Policy Certificate, and the return of any excess premiums

paid.

This Court is not a trier of fact and will not disturb

- 6 -

findings made by the trial court unless there is a clear preponderance of evidence against such findings. Merritt v. Merritt, (1974), 165 Mont. 172, 177, 526 P.2d 1375. An examination of the entire record supports the theory advanced by St. Paul and adopted by the trial court. There is no dispute that the whole purpose of the agreement was to: (1) avoid duplicate coverage and duplicate premiums; and (2) avoid cancelling existing coverage that would not be duplicated. There is no dispute that in furtherance of these goals, all duplicate coverage would be cancelled effective July 1, 1973. While the physical comparison of the policies, the return of unearned premiums, and the signing of the "Lost Policy Certificate and Release" still had not been carried out, we do not think this detracts from the substance of the original agreement. Because, at the time of the agreement, the National Indemnity policy was not available for comparison, the parties comprised a simple formula: all duplicate coverage would be cancelled as of the effective date of the National Indemnity policy. There was a meeting of the minds and all the material facts necessary to construct this formula were before the parties. To hold that on October 23, 1973, there indeed was duplicate coverage would be contrary to the manifest and undisputed intentions of all the parties to the agreement.

In view of our decision upholding the District Court's conclusion of law No. I, there is no need to discuss the court's alternative conclusion.

The judgment is affirmed.

John Conway Harrison
Justice

We concur:

_Frank I. Haswell_
Chief Justice

_Gene B. Daly_

_Daniel J. Shea_
Justices

_M. James Sorte_
Hon. M. James Sorte, District
Judge, sitting in the vacant seat
on the Court.