**UNITED STATES of America, Plaintiff-Appellant,**

**v.**

**LAZY FC RANCH et al., Defendants-Appellees.**

**No. 71–2318.**

United States Court of Appeals, Ninth Circuit.

July 13, 1973.

---

Michael H. Stein (argued), L. Patrick Gray, III, Atty. Gen., Dept. of Justice, Washington, D. C., Sidney E. Smith, U. S. Atty., Boise, Idaho, Alan S. Rosenthal, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Lloyd J. Walker (argued), of Walker & Depew, Twin Falls, Idaho, for defendants-appellees.

Before BROWNING and CHOY, Circuit Judges, and KING,* District Judge.

CHOY, Circuit Judge:

The United States brought suit against the Lazy FC Ranch and four of its partners (the Ranch) under the False Claims Act, 31 U.S.C. § 231 to recover money paid by making false claims. In the alternative the government sought to recover for money erroneously paid by mistake of fact or law under 28 U.S.C. § 1345. The district court, 324 F.Supp. 698, granted judgment for the Ranch on both claims. On appeal, the United States contests only the denial of its alternate claim for recovery of money erroneously paid.

The significant facts are not in dispute and the case was submitted to the district court on the basis of briefs and without trial. The Ranch was a partnership organized in 1952 to acquire and operate agricultural and pasture land in Cassia County, Idaho. In 1957 certain of the partners met with Marlin Lind, then manager of the Cassia County Office of the Agricultural Stabilization and Conservation Service of the Department of Agriculture (ASCS), to determine whether the partnership lands could qualify under the Acreage Reserve and Conservation Reserve programs of the Soil Bank Act, 7 U.S.C. § 1801, et seq. Lind informed the partners that the partnership would be considered to be a single producer and therefore subject to a maximum payment limitation which would make its participation in the soil bank programs economically unprofitable.

However, Lind learned that the Ranch was set up so that some of the partners were responsible for specialized areas of production (i. e. one of the partners was responsible for the potato crop; one had prime responsibility for livestock, etc.). Accordingly, Lind and the County Committee determined that the partnership could qualify as several producers and thereby partially avoid the payment limitation. However, it was necessary to formalize this working relationship and, with the help of Lind, the partnership lands were divided into five parcels. One of the parcels was leased to each of the four partners and a fifth unit was retained by the partnership. The leases provided that the partnership would retain twenty per cent of the income from the leased lands as rent and that the individual lessees would receive the remaining eighty per cent.[1]

Lind and the County Committee then approved Acreage Reserve and Conservation Reserve contracts between the United States and the individual partners and the partnership. These contracts were further approved by the program specialists from the State ASCS office. Although the contracts under both soil bank programs were to run for five years, the United States terminated the Acreage Reserve program after 1958.

---

* The Honorable Samuel P. King, United States District Judge for the District of Hawaii, sitting by designation.

1. Despite the leases the individual partners deposited all the proceeds from their government contracts into the general partnership account and all funds were treated as partnership income. The government contends that this factor should prevent us from granting equitable relief. We disagree. Mr. Lind testified that there was nothing improper in this action since ASCS was only concerned with operation of the crops. ASCS was not concerned about the partnership division of the profits. Moreover, the district court rejected the government's argument that the leases were improper and we cannot say that he was clearly erroneous.

After the Acreage Reserve contracts were terminated, the partners requested termination of their Conservation Reserve contracts, but they were denied permission to do so by the ASCS County Committee. The Ranch was sold in its entirety in the fall of 1961, thereby terminating the remaining contracts at that time.

In December, 1961 the State Committee of the ASCS determined that the contracts of the partners were in violation of regulations which explicitly disapproved the leasing of partnership land by partners as a means of avoiding the Soil Bank maximum payment limitations.[2] However, the regulations that were in effect at the time the contracts were entered into did not preclude this type of arrangement,[3] so the State Committee determined that the partners had not engaged in a scheme or device to evade the payment limitations. The Committee recommended that the partnership be permitted to retain the funds received, and gave the partnership permission to apply for equitable relief under Section 128 of the Soil Bank Act, 7 U.S.C. § 1816. Section 128 provides an administrative procedure authorizing the Secretary of Agriculture, in order to provide fair and equitable treatment, to pay a producer compensation under these programs which he otherwise would not be entitled to receive because of irregularities in the contract or its performance caused by erroneous advice of an authorized representative of the Secretary. Application for relief was made by the partners, but for undisclosed reasons was denied by the Secretary.

The United States then instituted this suit. In the district court all parties conceded that the partners were paid money to which they were not entitled under the applicable regulations. The Ranch, however, contended that the government was estopped from maintaining the action as a matter of equity because of the erroneous advice given by its employees and relied on by the Ranch. The district court recognized the general rule that the United States cannot be estopped by the unauthorized acts of its employees. Utah Power and Light Co.

2. The regulations in effect after March 28, 1958 read in part:

> (c) *Limitation on compensation.* (1) The total of all acreage reserve payments for all commodities under the 1958 acreage reserve program to any producer with respect to any individual farm shall not exceed $3,000. In applying such limitation in cases where two or more individuals are interested in a farming operation as landowners, landlords, tenants or sharecroppers, the following rules shall be effective to determine whether such individuals are to be treated as one producer or as separate producers:
>
> (i) A partnership shall be considered as one producer and compensation to the partnership shall not exceed $3,000 per farm. Individual members of the partnership may be considered as separate producers on the same farm, or recognized in another capacity on the same farm, as landowners, landlords, tenants or sharecroppers, only if (a) the individual members operating in a separate capacity are not identical with the membership of the partnership, and (b) the individual members also operated as

separate producers or in a separate capacity as producers on the farm during 1957 . . . 23 Fed.Reg. 2070.

The above regulations relate to the Acreage Reserve program but the regulations applicable to the Conservation Reserve Program are similar.

3. The regulation in effect at the time the contracts were executed read as follows:
*Limitation on payments.* The total of all annual payments under the conservation reserve program to any producer for any year with respect to all farms in which he has an interest shall not exceed $5,000, except that with the approval of the Secretary the total annual payment limitation may be increased in any case where the entire eligible land on a farm is designated as conservation reserve or where the erosion hazard is such that an increase in the limitation is warranted in order to more effectively accomplish the purposes of the program. 21 Fed.Reg. 6296 (August 22, 1956).
This regulation relates to the Conservation Reserve program but the regulations applicable to the Acreage Reserve program are similar.

v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917); Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). But the court felt that the doctrine had since been undermined by recent appellate court decisions, notably United States v. Georgia-Pacific Co., 421 F.2d 92 (9th Cir. 1970) and Brandt v. Hickel, 427 F. 2d 53 (9th Cir. 1970), which held that estoppel may be asserted against the government especially when the government acted in a proprietary capacity. The court felt that in this case the government was involved in ordinary contracts with individuals and therefore subject to the estoppel defense and not entitled to recover the improper payments.[4] We affirm but base our decision on a different rationale.

Traditionally, estoppel against the government has not been favored. The leading case expressing the limitations of equitable estoppel against the government is *Merrill, supra.* In *Merrill* a partnership engaged in wheat farming applied to the Federal Crop Insurance Corp. (FCIC), a wholly owned government enterprise, for crop insurance. The local agent advised the Merrills that their entire crop was insurable, but after part of the crop was destroyed the FCIC refused to compensate them. The FCIC claimed that its regulations did not permit insurance on their type of wheat and the local agent's advice was incorrect. The Merrills argued that the agency should be estopped from denying liability, but the Supreme Court ruled that the Merrills had constructive notice that the agency's regulations did not permit insurance on their type of crop. The Court refused to estop the government because of the unauthorized statements made by the local agent.

*Merrill* undoubtedly stands for a restrictive notion of the applicability of the estoppel defense against the government. But we do not read the decision as completely foreclosing the use of the estoppel defense. It should be noted that in *Merrill,* the farmers had no alternate means of obtaining crop insurance since there were no private companies in that business and therefore, they did not rely to their detriment on the erroneous advice. Thus, although the case presents some hardship, the Merrills did not sustain a profound, unconscionable injury in relying on the local agent's erroneous advice.

■ We think the estoppel doctrine is applicable to the United States where justice and fair play require it. The Supreme Court applied this rationale in Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951). In *Moser* a Swiss citizen who was registered in New York City under Selective Service asked the Swiss Legation concerning his deferment from military service in the United States Armed Forces. Moser was told that he could claim exemption under the Treaty of 1850 between the United States and Switzerland. Our State Department, the Selective Service Headquarters and the Swiss Legation arranged for Moser's exemption under treaty and furnished him an application form on which had been deleted words expressly waiving citizenship when claiming exemption. Relying on the arrangement, Moser applied for the exemption. However, when he later applied for citizenship he was informed that Congress had specifically provided that anyone who took advantage of the military exemption was precluded from obtaining citizenship. The Court held that because of the misleading circumstances of the case Moser was not barred from citizenship since he did not knowingly waive his rights to citizenship. While the Court did not mention

---

4. The district court also based its conclusion that the government was estopped on an alternate ground. The court ruled that because Congress had provided an administrative procedure for the forgiving of illegal overpayments under the Soil Bank Act, the United States had consented to be estopped. In light of our decision we need not reach this issue, but we doubt the soundness of this ground.

*Merrill* and said there was no need to consider estoppel, in effect the Court held, in the language of a leading commentator, that "the government was estopped." 2 K. Davis, Administrative Law Treatise, § 17.03, p. 504. The Court permitted the government to be estopped even though it was acting in its sovereign capacity because under the circumstances of the case, to do otherwise would violate notions of "elementary fairness." *Moser, supra,* 341 U.S. at 47, 71 S.Ct. 553.

This court has also followed this rationale and permitted the estoppel defense against the government in cases where basic notions of fairness required us to do so. A leading example of the application of this principle is Schuster v. C. I. R., 312 F.2d 311 (9th Cir. 1962). In *Schuster,* the Commissioner originally determined that certain assets of an estate were not subject to taxation. Relying on this ruling, the trustee then distributed all the estate's assets. A year later the Commissioner reversed his decision and sent the trustee and the beneficiary deficiency notices. On appeal, we held that the Commissioner was estopped from asserting liability against the trustee, but that the beneficiary was liable for any tax deficiencies. We recognized the general principle that estoppel could not be asserted against the government, but ruled that the Commissioner could not always correct a legal mistake "regardless of the injustice which will result. It is conceivable that a person might sustain such a profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair play, that the Commissioner not

be allowed to inflict the injury." *Schuster, supra* at 317.

Again in Brandt v. Hickel, *supra,* we permitted the estoppel defense to be asserted reasoning that "some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement . . . The Secretary was understandably concerned that the estoppel doctrine can have a deleterious effect on administrative regularity. However, administrative regularity must sometimes yield to basic notions of fairness." *Brandt, supra,* 427 F.2d at 56–57.

■ The *Moser-Brandt-Schuster* line of cases establish the proposition that estoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel. Gestuvo v. District Dir. of I. N. S., 337 F.Supp. 1093 (C.D.Cal.1971). This proposition is true even if the government is acting in a capacity that has traditionally been described as sovereign (as distinguished from proprietary) although we may be more reluctant to estop the government when it is acting in this capacity.[5] *See Georgia-Pacific, supra.*

■ In the case at bar, it would be a great injustice if the government were not held responsible for the advice it gave the Ranch. The partnership would not have entered into the soil bank program had it not been for the advice and assistance of agent Lind, as confirmed by both the County Committee and the

---

5. The district court ruled that the government was acting in a proprietary function in this case. On appeal the government contends that it was acting in its sovereign capacity in furthering the statutory aim of reducing excess agricultural production. As the court below recognized it is often difficult to determine the precise category of a particular governmental function. But we need not resolve this conflict because it is clear that in *Moser, supra,* and *Schuster, supra,* the

government was acting in a sovereign capacity. Thus, even when the government is acting in a sovereign capacity the estoppel defense may be asserted against it. When the government is acting in a proprietary capacity it is much more likely that the public's interest will not be unduly damaged by the imposition of the estoppel defense. Pitner v. Federal Crop Insurance Corp., 94 Idaho 496, 491 P.2d 1268 (1971).

state program specialists.[6] At the time the partners entered into the contracts, even the agency's published regulations arguably permitted this type of arrangement. Moreover, not only did the partners rely on the government's approval of their contracts but after 1958 the Ranch requested permission to terminate the contracts. At this time, the more complete regulations had been published and it was clear that the arrangement was improper, but the government never apprised the partnership of this, and in fact refused permission to terminate the agreements.

The United States received the full benefits of the contract and the partners lost at least as much profit from not farming as they received in government payments. We do not think that under these circumstances the public policy of the United States would be significantly frustrated by permitting the partners to retain the additional payments that were improper only because they exceeded the maximum payment regulations.

Affirmed.

---

6. We think it important to note that the more responsible the individual giving the advice, the more reasonable the reliance and the greater the injustice in not permitting the application of the estoppel defense. This factor in part explains such decisions as United States v. Rossi, 342 F.2d 505 (9th Cir. 1965).