**VICKARS–HENRY CORPORATION,
Petitioner,**

v.

**BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,
Respondent.**

**No. 77–3890.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1980.

Decided Oct. 6, 1980.

Donald H. Upjohn, Salem, Or., argued for petitioner; Carl M. Byers, Heltzel, Byers & Upjohn, Salem, Or., on brief.

James V. Mattingly, Jr., Arlington, Va., argued for respondent; John D. Hawke, Washington, D.C., on brief.

Before SKELTON,* Senior Judge, Court of Claims, and FARRIS and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge:

Vickars–Henry Corporation (V–H) petitions for review of an order of the Board of Governors of the Federal Reserve System (Board) denying V–H's request for certification as a "qualified bank holding company," as defined in section 1103 of the Internal Revenue Code (I.R.C.), 26 U.S.C. § 1103, and section 2 of the Bank Holding Company Act, 12 U.S.C. § 1841.[1] The requested certification would have permitted V–H to distribute to its two shareholders its holdings in an Oregon bank by way of a tax–free distribution under I.R.C. § 1101(b). Under

---

* Hon. Byron G. Skelton, Senior Judge of the United States Court of Claims, sitting by designation.

1. This court's jurisdiction is based on 12 U.S.C. § 1848.

section 1101, a company wishing to distribute to its shareholders the property that causes the company to be considered a bank holding company may do so without any gain being recognized to its shareholders, provided the company has been certified as a "qualified bank holding company" by the Board. V–H argues that it should have received such certification as a matter of law under both the Bank Holding Company Act, 12 U.S.C. §§ 1841–1849, (sometimes referred to as "Act") and the Board's regulations. V–H also argues that, since it has already been required to submit to regulation, albeit without certification, as a bank holding company for six years, the Board should be estopped from now denying the requested certification. The Board contends that V–H lacks standing to bring this appeal. The Board also argues that its 1977 order denying certification resulted from a proper application of Board regulations, under which V–H could not be considered a bank holding company because it did not "control" the bank whose stock it owned. For the reasons given below, we deny the petition for review and affirm the order of the Board.

I. *Facts*

V–H operates an insurance business in Salem, Oregon. Its two shareholders, Mr. Compton and Mr. Smith, are also its chief executives and directors. Compton and Smith hold the same positions in another corporation, the Pioneer Trust Company (Pioneer Bank), which operates a commercial bank in Salem. In 1968, V–H received 16.4% of Pioneer Bank's outstanding shares upon V–H's sale to Pioneer Bank of real property adjoining the site of the Bank's offices. In 1970, Compton and Smith, as individuals, together owned 60.1% of Pioneer Bank's outstanding shares. As of 1977, Compton and Smith owned 33% and 21% respectively, for a combined total of 54%.

In 1970, Congress amended the Bank Holding Company Act to subject one–bank holding companies, i. e., those holding companies owning or otherwise controlling only a single bank, to the same federal controls that had been established previously for multi–bank companies. In January 1971, the Federal Reserve Bank of San Francisco (Reserve Bank) advised all banks in its district that one–bank holding companies were now included within the scope of the Act. Each bank was requested to inform the Reserve Bank if the bank was owned or thought to be "controlled," either directly or indirectly, by any company. Pioneer Bank responded by setting out V–H's interest. The Reserve Bank, in turn, informed V–H that "it would appear" that V–H would be considered a bank holding company under the Act. The Reserve Bank later notified V–H that, based on the information V–H had submitted, "it appears . . . your company . . . is required to register with the Board of Governors." V–H then filed a registration statement which the Reserve Bank accepted as "legally and informationally sufficient" on May 14, 1971. On July 21, 1971, in response to a request by V–H for certification under I.R.C. § 1101, the Board, through the Reserve Bank, informed V–H by letter that it could not be certified for purposes of a tax–free distribution because V–H was not a bank–holding company under the Act of 1956 or the Amendments of 1966. The reason for this result was that Congress failed to amend I.R.C. § 1101 to provide for certification of one–bank holding companies when it passed the 1970 Amendments bringing one–bank holding companies within the scope of the Bank Holding Company Act. The Board's letter indicated, however, that Congress was considering remedial legislation to rectify this omission by bringing one–bank holding companies within section 1101. In response to the Board's letter, V–H wrote that it had "no desire to be subjected to any further governmental regulation," and that "if there is any doubt about [our] status under the . . . Act, we wish to have it resolved immediately." A member of the Reserve Bank's legal department then told V–H's counsel by telephone that the Board was considering adopting certain regulatory presumptions on control to implement the 1970 amendments, and that until such a regulation was promulgated,

V–H's status as a bank holding company would not be clear. The Board did subsequently adopt regulation 12 C.F.R. § 225.2, which creates a rebuttable presumption of control if a company holds more than five percent of a bank, and company officers, directors, or controlling shareholders hold additional bank shares such that the total bank shares held by the company and individuals connected with it exceed 25% of the bank's outstanding shares. When V–H received a copy of this regulation, in September 1971, it conceded by letter that it was covered by the Act.

In March 1972, the Reserve Bank informed V–H that it was required under the Act and the Board's regulations to file an annual report with the Board. When V–H asked for verification of this requirement, the Chief Examiner of the Reserve Bank replied that V–H was indeed required to file an annual report. V–H has since filed all required reports and submitted to the Board's audits and inspections.

Although Board rosters of bank holding companies have, since 1970, carried a notation indicating that control determinations have not been made as to some registrants, no such notation was ever made in reference to V–H. V–H claims that the fact that it was prohibited from making further acquisitions under 12 U.S.C. § 1843 prevented it from continuing to grow through acquisition of other insurance agencies.

In 1976, Congress passed amendments to I.R.C. § 1103, extending the benefits available under I.R.C. § 1101, i. e., the right of companies to make tax–free distributions after certification by the Board, to companies brought within the scope of the Bank Holding Company Act by the 1970 amendments. On January 10, 1977, V–H requested certification under I.R.C. § 1101. On June 16, 1977, the Board's General Counsel, empowered by the Board to issue certifications on the Board's behalf, issued its opinion that V–H was not a bank holding company within the. terms of the Act. V–H then requested either reconsideration or a formal Board order denying the application for certification. On November 15, 1977, the Board denied the request and reaffirmed its conclusion that V–H was not a bank holding company within the terms of the Act, on the ground that V–H did not "control" Pioneer Bank.

II.  *Standing*

■   Section 9 of the Act, 12 U.S.C. § 1848, provides that "[a]ny party aggrieved by an order of the Board . . . may obtain review of such order in the United States Court of Appeals . . . ." The Board argues that the use of the term "party aggrieved" in section 9 means that the complaining party must demonstrate that it has suffered injury in fact due to some action of the Board.[2] According to the Board, the only potential injury arising from its denial of the requested certification would be to the two shareholders, since it is they who will thereby be prevented from receiving a distribution of V–H's Bank shares tax–free. The Board argues that since the certification denial causes V–H itself no injury, it has no standing to appeal under section 9. The record satisfies us that V–H has demonstrated sufficient "injury in fact" to have standing to appeal the Board's order.

First, it appears that, under I.R.C. §§ 1101 and 1103, it is the company that must request Board certification.[3] When the Board rejects a company's request, it follows that the company, on behalf of its shareholders and itself, must have standing to prosecute the appeal. Otherwise, Board

---

**2.** *Cf., Martin–Trigona v. Federal Reserve Board*, 509 F.2d 363, 365–66 (D.C. Cir. 1974) (upholding the Board's refusal to allow a company to intervene in hearings regarding a merger between a bank holding company and a non -banking company where the party requesting to intervene refused to state what particular interest it had in the transaction).

**3.** *See* 26 U.S.C. § 1103(b)(2)(C) ("A corporation shall be treated as a qualified bank holding corporation only if the Board certifies that it satisfies the foregoing requirements of this subsection"). *See also* 26 C.F.R. §§ 1.1102–2(c) and (n) (1979); 12 C.F.R. § 225.2(c)(2) (1979) ("A *company* may request a hearing to contest the Board's preliminary determination of control") (emphasis added).

decisions in tax certification cases might be wholly insulated from judicial review, a result that Congress, in light of its enactment of section 9, does not appear to have intended.

Secondly, as long as V–H still owns 16% of Pioneer Bank's stock, it may well be subject to a future Board determination that V–H has sufficient "control" over the Bank to require that V–H again be subject to Board regulation. Since the Board's denial of certification seems to have been based largely on the fact that two of Pioneer Bank's current shareholders owned enough stock, in their own right, to give them control, any change in the percentage holdings among current shareholders could trigger a new finding that the shares held by V–H and persons connected with it give V–H sufficient potential voting strength as to be considered a "controlling influence" in the Bank. Thus, to avoid the possibility of future regulation by the Board, V–H may wish to distribute its Pioneer Bank stock. Because the Board's order deprives V–H's shareholders of the benefits of I.R.C. § 1101, it makes a distribution much less likely. The practical effect of the Board's order therefore is to prevent V–H from ending the threat of future regulation.

Finally, we note that the Board's argument with regard to V–H's standing on this petition conflicts with the Board's apparent position at the time the Board issued the November 1977 order. That order was based on a review, under 12 C.F.R. § 265.3, of the General Counsel's decision denying certification. Review by the Board under 12 C.F.R. § 265.3 is available only to persons claiming to be "adversely affected," by a decision of the General Counsel. If V–H was "adversely affected" by the General Counsel's decision, one would think it would be equally "aggrieved" by an order of the Board upholding that decision. Thus, our finding that V–H has standing under section 9 is supported by the Board's application of its own rules for standing on petitions to review decisions of its General Counsel.

III. *Certification*

■ V–H claims that the Board was incorrect in failing to certify V–H as a "qualified bank holding company," as defined in I.R.C. § 1103 and section 2 of the Bank Holding Company Act, 12 U.S.C. § 1841, for purposes of a tax–free distribution under I.R.C. § 1101. V–H bases this argument on its reading of section 2 and the Board's regulations promulgated thereunder.

Section 2 defines bank holding company as "any company which has *control* over any bank" 12 U.S.C. § 1841(a)(1) (emphasis added). It then states that a company has control over a bank if at least one of three tests is met. Two of these tests are arguably relevant here. The first, or "twenty–five percent," test provides that a company will be considered to have "control" over a bank under section 2 if "directly or indirectly or acting through one or more other persons [the company] owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank." 12 U.S.C. § 1841(a)(2)(A). The second, or "controlling influence," test provides that a company will be considered to have control if "the Board determines, after notice and opportunity for hearing that the company directly or indirectly exercises a controlling influence over the management policies of the bank." 12 U.S.C. § 1841(a)(2)(C).

For purposes of making "controlling influence" determinations under the second test, the Board has, by regulation, established the following "rebuttable presumption of control":

A company that owns, controls, or has power to vote more than 5 percent of any class of voting securities of a bank . . . presumably controls that bank . . . if additional voting securities are owned, controlled, or held with power to vote by individuals . . . who are directors, officers, trustees, or partners of the company (or own, directly or indirectly, 25 percent or more of any class of voting securities of the company), and, together with the company's securities, aggregate 25 percent or more of any class of voting securities of that bank. . . .

12 C.F.R. § 225.2(b)(2). Since V–H owned 16% of Pioneer Bank, and V–H officers and shareholders owned more than 50% of the Bank, V–H arguably could have been found to "control" the Bank under either the "twenty–five percent" or the "controlling influence" test.

In its order reviewing the General Counsel's denial of certification, the Board found that V–H did not "control" Pioneer Bank within the meaning of 12 U.S.C. § 1841(a), because

> it appears that absolute control of both Bank and Vickars–Henry is held by Messrs. Compton and Smith as individuals, and that Vickars–Henry's 16.4 per cent interest in Bank adds nothing to [Compton's and Smith's] ability to control Bank in their personal capacities.

### Controlling Influence Test

Insofar as the Board's order supports a determination under the controlling influence test of section 2(a)(2)(C) that the company does not exercise a "controlling influence" over the management of Pioneer Bank, there is little basis for disturbing that determination on this appeal. V–H contends that the Board's only justification for not finding that V–H "controls" Pioneer Bank, under the rebuttable presumption set forth in Regulation § 225.2(b), is that, according to V–H's characterization, the Board has the unfettered option of electing not to invoke the presumption. V–H argues that this position is untenable since Regulation § 225.2(c)(2) provides that the presumption will be considered "in accordance with the rules of evidence," and, under rules of evidence, once the underlying facts necessary to raise a rebuttable presumption have been established, the trier of fact, absent contrary evidence, must find in accordance with the presumption. In responding to the position attributed to it by V–H, the Board correctly states that the presumption set forth in section 225.2(b) is rebuttable upon a Board determination that more persuasive evidence to the contrary

indicates that the company does not actually exert a "controlling influence" (e. g., because the stock owned by other shareholders is sufficient to give those shareholders outright control). This position is supported by the fact that the bulletin and letter announcing the adoption of the presumption indicated that the control presumption may be overcome by evidence to the contrary.[4] We therefore uphold the Board's determination under section 2(a)(2)(C).

### Twenty–five Percent Test

Section 2(a)(2)(A) of the Act directs that V–H be conclusively presumed to be in control of the Bank if it "directly or indirectly or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities" of the Bank. Since V–H directly owns only sixteen percent of the Bank, it can satisfy the twenty–five percent test only if it "indirectly . . . owns" shares owned by Compton or Smith or "act[s] through" Compton or Smith or both such that their interest should be imputed to V–H.

The Board's certification responsibility under I.R.C. § 1101 requires that it apply the definition of "bank holding company" contained in section 2 of the Act. I.R.C. § 1103(a)(1). In applying that definition, the Board refused to find that V–H indirectly owned its shareholders' shares or that it acted through its shareholders–a basic fact essential to invocation of the conclusive presumption of control erected by the twenty–five percent test. Under section 9 of the Act, "The findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive." 12 U.S.C. § 1848.

The Board's finding is supported by substantial evidence. V–H's holdings in the Bank were acquired subsequent to the acquisitions by Smith and Compton. They added nothing to Smith and Compton's control of the Bank. In these circumstances, the Board could reasonably find that V–H

---

4. *See* 36 Fed.Reg. 18,945 (1971). *Compare* 12 C.F.R. § 225.2(b) (1979) ("Rebuttable presumptions") *with* 12 C.F.R. § 225.2(a) (1979) ("Conclusive presumptions").

did not indirectly own Compton and Smith's shares, and did not act through either Smith or Compton. Accordingly, we affirm both the Board's determination that V–H did not control the Bank and its refusal to certify the proposed transaction under I.R.C. § 1101.

## IV. *Estoppel*

■ V–H, which has been required to submit to apparently unwarranted classification and regulation as a bank holding company for six years, will not, if the Board's 1977 order is allowed to stand, be permitted to realize one of the few benefits which derive from that classification. V–H therefore argues that, on the facts set out above, this court should find that the Board is estopped from now denying V–H the requested certification.

The Board's response is two–fold. First, the Board claims that the information V–H relied on was non–binding advice from the local Reserve Bank rather than authoritative information from the Board itself. Secondly, V–H's alleged reliance is said to have been unjustified because V–H failed to follow the statutorily prescribed procedural requirements through which an authoritative control determination could have been obtained. According to the Board, rather than relying on the advice of a Reserve Bank, which is not authorized to make a binding control determination, V–H, if it intended to qualify for a tax free distribution, should have sought an authoritative determination of its bank holding company status from the Board under 12 C.F.R. § 225.2(c). That regulation provides that, after a preliminary determination of control, a company must take one of the following courses of action: (1) indicate an intention to terminate control, (2) seek Board approval to retain control, (3) register as a bank holding company, or (4) contest the control determination.

V–H argues that it was justified in not contesting the determination, and that it, instead, properly followed the third alternative of simply registering. V–H justifies its failure to contest the determination as follows: (1) the language of the statutes and regulations was broad enough to support the Board's assertion of control; (2) as a question of statutory interpretation, the Board, in making its preliminary determination, was in the best position to judge whether V–H fell within the intended scope of the Act; and (3) it would be ridiculous to expect any company to prosecute a costly administrative appeal from a classification which, according to the Board, might entitle the company to tax relief once Congress had acted favorably on proposed legislation.

■ The rules governing estoppel claims against the government have been discussed at length in *United States v. Ruby Co.*, 588 F.2d 697 (9th Cir.1978). Fundamental to such a claim is that, in addition to satisfying the elements of ordinary estoppel, the governmental conduct complained of must amount to "affirmative misconduct." *Santiago v. Immigration and Naturalization Service*, 526 F.2d 488, 491 (9th Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). In the instant case, the affirmative misconduct requirement "must be read as requiring an affirmative misrepresentation or affirmative concealment of a material fact by the government." *United States v. Ruby Co.*, 588 F.2d at 703–704. V–H also has the burden of proving the four elements of ordinary estoppel:

(1) The party to be estopped (the government) must know the facts;

(2) The party to be estopped must either intend that its conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) The party asserting the estoppel must be ignorant of the true facts; and

(4) The party asserting the estoppel must rely to its detriment on the conduct of the party to be estopped.

*Morris v. Andrus*, 593 F.2d 851, 854 (9th Cir.1978); *United States v. Ruby Co.*, 588 F.2d at 703.

In applying these elements to the instant case, it may be helpful to compare the facts of this case to those of two earlier cases

before this court. In *United States v. Lazy F C Ranch*, 481 F.2d 985 (9th Cir.1973), this court held that the government was estopped from recovering payments made to an agricultural partnership in excess of the Soil Bank Act's payment limitations. There, a contract under which the challenged payments had been made would never have been entered into had not the government's local officials advised the parties that the proposed contract would avoid the Act's payment limitations. Moreover, that official advice as to the contract's validity was arguably supported by then–existing regulations, and by the fact that, after subsequent regulations indicated that the contract was no longer valid, the government failed either to so advise the partnership or permit it to terminate the contract.

In *California Pacific Bank v. Small Business Administration*, 557 F.2d 218 (9th Cir. 1977), a bank had adopted a plan to make its Small Business Administration (SBA) 90% guaranteed loans virtually riskless, despite clear statutory and regulatory prohibitions to the contrary. This court found that the bank was not justified in relying on the SBA's receipt of vague covering letters referring to the plan; the failure of SBA's local counsel to object to the bank's scheme upon inspection of the first loan file; or the agency's failure to reject the plan outright when first presented with a complete draft. Accordingly, this court held that, in adopting a program clearly contrary to established statutory and administrative policy, a party has the duty to seek and obtain an authoritative renunciation of the regulatory strictures prohibiting it.

The facts of the instant case place it somewhere between these two prior cases. Unlike the parties in *Lazy F C Ranch*, V–H never received any official indication that it actually qualified for the government benefits it was seeking. Although V–H received strong indications that it would be considered a bank holding company under the Board's regulations, V–H had no firm basis for expecting to be permitted to carry out a tax–free distribution of its bank stock under the proposed amendments to the Tax Code, which were not passed until 1976. Unlike the bank in *California Pacific Bank*, however, V–H was not acting under any plan made clearly unlawful by statute and regulation. On the contrary, V–H relied on the Board's preliminary determination that it was a "bank holding company" under the Act and the Reserve Bank's acceptance of V–H's registration on that basis. Since the preliminary determination was supported by the Bank Holding Company Act's broad language and by the Board's rebuttable presumption of control, V–H, like Lazy F C Ranch, had no real basis for challenging the agency's determination, especially when that determination might one day entitle the company to receive certain benefits, (i. e., higher payments in *Lazy F C Ranch*, and non–recognition of gain to shareholders on a stock distribution in the instant case).

Since V–H was not entitled to any tax relief until the passage of the 1976 amendments to the Tax Code, and since V–H received a prompt determination from the Board on its request for certification under those amendments, the official indications and advice V–H claims to have relied on as to its entitlement to certification prior to 1976 were considerably more nebulous and contingent than those relied upon in *Lazy F C Ranch*. Therefore, although the question is a close one, we find that V–H has failed to present us with sufficient grounds for ordering the Board to certify V–H as a bank holding company for purposes of a tax–free distribution. Accordingly, the Board's order of November 1977 is

AFFIRMED.