**STATE OF OREGON, DEPARTMENT OF HUMAN RESOURCES, and Children's Services Division, Plaintiffs,**

**v.**

**Margaret M. HECKLER, Secretary, and the United States Department of Health and Human Services, Defendants.**

**Civ. No. 83–1466FR.**

United States District Court, D. Oregon.

Jan. 31, 1984.

Dave Frohnmayer, Atty. Gen., William F. Gary, Deputy Atty. Gen., Karen H. Green, Asst. Atty. Gen., Salem, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Laury H. Hennings, Asst. U.S. Atty., Portland, Or., for defendants.

FRYE, District Judge:

This is an action brought by the State of Oregon for judicial review of a final decision of the Grant Appeals Board (Board) of the Department of Health and Human Ser-

vices (DHHS). The Board's decision disapproved the State of Oregon's claim for federal reimbursement of certain costs incurred by the Children's Services Division (CSD) from July 1, 1979 through September 30, 1980 in the sum of $1,715,246. The defendant has moved for summary judgment. There are no disputed facts.

At issue is whether the federal government is required to reimburse the State of Oregon for certain administrative costs relating to CSD's Aid to Families with Dependent Children—Foster Care (AFDC–FC) program. The administrative costs claimed by the State of Oregon cover expenses for case assessment, service plan development, direct contact with courts and parents, child placement, and staff supervision. The State of Oregon seeks reimbursement of these costs under Title IV–A of the Social Security Act (the Act), 42 U.S.C. §§ 601 *et seq.* The DHHS takes the position that the costs in question are not reimbursable under Title IV–A in light of a 1975 amendment to section 403(a)(3) of the Act [42 U.S.C. § 603(a)(3)]. The Board agreed with DHHS and also rejected the State of Oregon's argument that prior conduct of DHHS should estop DHHS from denying reimbursement to CSD.

### THE STATUTORY DISPUTE

In 1961 the AFDC–FC program was instituted as section 408 of the Act [42 U.S.C. § 608]. This program provides federal financial participation (FFP)—federal grants—for the cost of supporting certain foster care children who have been removed from their homes for their own best interests. Section 408(f) sets forth certain services that must be contained in a state AFDC plan:

... provision for (1) development of a plan for each such child (including periodic review of the necessity for the child's being in a foster family home or child-care institution) to assure that he receives proper care and that services are provided which are designed to improve the conditions in the home from which he was removed or to otherwise make possible his being placed in the home of a relative specified in section 606(a) of this title, and (2) use by the State or local agency administering the State plan, to the maximum extent practicable, in placing such a child in a foster family home or child-care institution, of the services of employees, of the State public-welfare agency referred to in section 722(a) of this title (relating to allotments to States for child welfare services under sections 721 to 728 of this title) or of any local agency participating in the administration of the plan referred to in such section, who perform functions in the administration of such plan.

Section 408(d) requires that section 408(f)(2) services "shall be considered as part of the administration of the State plan for purposes of section 403(a)(3) of this title." Hence, the services listed in section 408(f) were claimed by the various states as social services entitled to FFP under Title IV–A until October 1, 1975.

Effective October 1, 1975, P.L. 93–647 established a new Title XX of the Act. Section 2002(a)(1) of this title authorizes federal grants for the funding of state programs directed at the goal of

(A) achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency,

(B) achieving or maintaining self-sufficiency, including reduction or prevention of dependency,

(C) *preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating, or reuniting families,*

(D) preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care, or

(E) securing referral or admission for institutional care when other forms of care are not appropriate, or providing services to individuals in institutions,

8

including expenditures for administration (including planning and evaluation) and personnel training and retraining directly related to the provision of those services (including both short- and long-term training at educational institutions through grants to such institutions or by direct financial assistance to students enrolled in such institutions). *Services that are directed at these goals include, but are not limited to,* child care services, protective services for children and adults, *services for children and adults in foster care,* services related to the management and maintenance of the home, day care services for adults, transportation services, training and related services, employment services, information, referral, and counseling services, the preparation and delivery of meals, health support services and appropriate combinations of services designed to meet the special needs of children, the aged, the mentally retarded, the blind, the emotionally disturbed, the physically handicapped, and alcoholics and drug addicts.

(Emphasis added). Section 2002(a)(2) placed a limit on the amount of FFP a state could receive under Title XX. This legislation also amended section 403(a)(3), the section granting FFP to states for Title IV-A. The amended section 403(a)(3) reads as follows:

(3) in the case of any State, an amount equal to the sum of the following proportions of the total amounts expended during such quarter as found necessary by the Secretary of Health, Education, and Welfare for the proper and efficient administration of the State plan—

(A) 75 per centum of so much of such expenditures as are for the training of personnel employed or preparing for employment by the State agency or by the local agency administering the plan in the political subdivision, and

(B) one-half of the remainder of such expenditures, *except that no payment shall be made with respect to amounts expended in connection with the provision of any service de-*

*scribed in section 2002(a)(1) of this Act other than services the provision of which is required by section 402(a)(19) to be included in the plan of the State;*

(Emphasis added). It is the effect of the underscored "except clause" that is at issue in this case.

The State of Oregon argues that because section 408(d) requires that section 408(f)(2) services be a part of a state's Title IV-A plan, costs expended on such services should be eligible for FFP under Title IV-A notwithstanding section 403(a)(3)'s "except clause." The State of Oregon's argument would eliminate the seeming inconsistency in the statute by interpreting the services covered by section 2002(a)(1) to exclude any service covered under section 408(f). In other words, if a service is required by section 408(f), then the service is not a service for children in foster care within the meaning of section 2002(a)(1). The DHHS argues that the plain meaning of the statute refutes the State's position. The "except clause" of section 403(a)(3) expressly prohibits FFP under Title IV-A "with respect to amounts expended in connection with the provision of any service *described in* section 2002(a)(1). . . ." (Emphasis added). If a service is described in section 2002(a)(1), DHHS argues, it is not eligible for FFP under Title IV-A even though it may be required as a part of a state's Title IV-A plan.

The first issue presented is the degree of deference this court will give to the agency's interpretation of the statute. The agency argues that this court must defer to the agency's interpretation if the interpretation is reasonable. *See, e.g., Columbia Basin Land Protection Association v. Schlesinger,* 643 F.2d 585 at 599–600 (9th Cir.1981),

The United States Supreme Court has consistently held that a federal agency's statutory interpretation, while not binding, is to be given great deference by reviewing courts. [Citations omitted]. . . . The standard of judicial review

is whether the agency interpretation was reasonable. It does not have to be the only reasonable construction or the interpretation a court would choose if first presented with the question; it must only be a reasonable interpretation. [Citations omitted].

*Id.* at 599–600. The State, however, argues that this rule is subject to the exception that a court need not defer to an agency's interpretation when the agency interpretation has not been consistent. For example, in *McCoog v. Hegstrom,* 690 F.2d 1280 (9th Cir.1982), the Ninth Circuit said:

An agency's interpretation of its own regulations is entitled to considerable deference by the courts. [Citation omitted]. But an agency's interpretations are not conclusive, and courts are not bound by them. [Citation omitted]. In particular, the deference due an administrative interpretation depends upon its consistency with earlier agency pronouncements, *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974), the purpose and wording of other agency regulations, *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980), and the purposes of the relevant statutes. [Citation omitted].

*Id.* at 1284. Moreover, in *Turner v. Prod,* 707 F.2d 1109 (9th Cir.1983), the court indicated that an agency's interpretation of a statute is simply one factor a court should look to in interpreting a statute:

The district court granted summary judgment on a pure question of law, the interpretation of a statute. There are no disputed facts. Therefore, the standard of review is *de novo;* the appellate panel applies the same test for summary judgment as did the district court.

In construing a statute in a case of first impression, the courts look to the traditional signposts for statutory interpretation: first, the language of the statute itself; and second, its legislative history and the interpretation given it by its administering agency, both as guides to the intent of Congress in enacting the legislation.

*Id.* at 1114 (citation omitted).

In the present case, the court finds that the DHHS's actions with respect to interpreting section 403(a)(3) were sufficiently inconsistent as to make it inappropriate for this court to defer to the agency's latest interpretation. Although the DHHS's approval of the State of Oregon's Cost Allocation Plan (discussed *infra* ) may not have bound the agency to fund the items in question, the approval of the plan implied an agency concurrence with the interpretation of section 403(a)(3) presently urged by the State of Oregon. Moreover, the Board itself found that approval of the State of Oregon's plan "indicated confusion on the part of officials within the Agency prior to the Agency's action transmittal in 1981...." Decision at 18. More likely than not, the apparent change in agency interpretation of section 403(a)(3) beginning in January, 1981 represents the desire of the administrative branch of government to reduce federal spending on social programs as much as possible. Given this background, the court believes that a *de novo* review of the statutory interpretation issue is appropriate.

As to the language and structure of the statute, the State of Oregon's position is that the only way to reconcile the seeming inconsistency between sections 408(d) and (f), which *require* states to provide the services at issue under Title IV–A, and sections 403(a)(3) and 2002(a)(1), which only allow FFP for the services under Title XX, is to read section 2002(a)(1) as excluding services states are required to provide under Title IV–A. The State of Oregon points out that section 2001 states that the purpose of Title XX is to "encourag[e] each State ... to furnish services" directed at certain goals, yet there is obviously no need to encourage states to provide services that they are already required to provide by Title IV–A. However, the State of Oregon's argument is not compelling. First, a literal and direct reading of the statute supports the DHHS's view. The "except

clause" of section 403(a)(3) excludes from FFP under Title IV–A "amounts expended in connection with the provision of any service *described in* section 2002(a)(1). . . ." (emphasis added). The most straightforward reading of this clause leads to the conclusion that if the service at issue is described in section 2002(a)(1), then it is not eligible for FFP under Title IV–A. There is no indication whatsoever in the language of the statute that services required to be included in a state's Title IV–A plan, which presumably will represent a large portion of a state's expenses under the plan, are not subject to the "except clause." Nor is there any indication in the language or structure of the statute that Congress intended to exclude from the services "described in section 2002(a)(1)" those services simultaneously required to be a part of a state's Title IV–A plan. Second, section 403(a)(3)'s "except clause" reads as follows:

> except that no payment shall be made with respect to amounts expended in connection with the provision of any service described in section 2002(a)(1) of this Act *other than services the provision of which is required by section 402(a)(19) to be included in the plan of the State;*

(Emphasis added.) Hence, the clause contains an explicit exception to the effect of the "except clause"—services required of states by section 402(a)(19) of Title IV–A may still be funded under Title IV–A even though they may also be described in section 2002(a)(1). Were the State of Oregon's position correct, this language would be unnecessary, because by reason of the fact that section 402(a)(19) services are required to be provided by states they would not, in the State of Oregon's view, be included under section 2002(a)(1) for purposes of the "except clause." Conversely, the fact that Congress explicitly stated that one particular group of services both required by Title IV–A and described in section 2002(a)(1) would continue to be eligible for Title IV–A funding under an exception to the except clause is evidence of its intention that all other services both required by Title IV–A and described in section 2002(a)(1) not continue to be eligible for Title IV–A funding.

Turning to the legislative history, each side argues that the legislative history supports its position, and both sides' arguments turn on the meaning and significance of funding limits or caps applied to the programs at issue. In 1972, P.L. 92–512 placed a cap on funding social services by adding section 1130 to the Act. However, section 1130(a)(2)(E) excepted from the cap foster care services under section 408. The purpose of this cap, the State of Oregon argues, is to control spending on *discretionary* state social service programs, but not to cap funding on mandatory state social service programs. When P.L. 93–647 enacted section 2002(a)(2) and amended section 403(a)(3), sections 408(d) and (f) were retained intact. The effect, the State argues, is that the cap on Title IV–A was transferred to Title XX (along with many social services), but the intent to continue to fund required programs and to cap only discretionary programs remained. As DHHS's interpretation runs counter to this intent (in that it applies the Title XX cap to required services), the State argues that the court should not adopt it. The DHHS argues that because this law repealed section 1130, transferred a large number of social services to the new Title XX and applied a new funding cap to that title, and enacted the "except clause" into section 403(a)(3), the clear intent of Congress was to limit all social services except those specifically exempted within the "except clause" itself. Finally, the DHHS notes that section 2002(a)(8) provides that if an expenditure is made under section 403 or 422 and is also allowable under section 2002(a)(1), payment is permitted under section 2002(a)(1) if the state has not already received reimbursement under the other sections. Hence, the DHHS argues, Congress clearly stated its intent in P.L. 93–647—an expenditure reimbursable under section 403 or 2002(a)(1) may be reimbursed under either section (but only once), but an overlapping expenditure not subject to reimbursement under section 403 (due to the except clause) is only reimbursable under section 2002(a)(1). This, the agency ar-

gues, indicates a mandate that "Congress did not intend to have costs for activities reimbursed under an uncapped program such as Title IV-A when these same costs were also within the scope of the capped Title XX program." (Board's Decision at 13).

Although the legislative history does not appear to strongly support either side, the court cannot say that the legislative history is in any way inconsistent with the DHHS's reading of the statute. Because that reading gives effect to the plain meaning of the statute, and because the State of Oregon has not convinced the court that the intent of Congress in enacting the statute runs counter to that plain meaning, the court finds that the DHHS's interpretation of the statute is correct.

## ESTOPPEL

■ The State of Oregon's second argument is that, even if the DHHS' statutory argument is correct, the actions of the agency with regard to the present case should estop it from disapproving the claim.

On July 12, 1979, the agency approved CSD's Administrative Cost Allocation Plan, as amended on June 19, 1979. The June 19 amendment expressly indicates that the State of Oregon intends to transfer the costs at issue from Title XX to Title IV-A in order to claim FFP for its CSD staff activities in the AFDC-FC program. The amendment clearly describes the activities, and the activities were the same as for which FFP has now been disallowed. The letter approving the allocation plan advised the State as follows:

> This approval presumes the existence of an accounting system with internal controls adequate to protect the interest of both State and Federal governments. *Approval of the cost allocation plan proposal does not constitute the approval of the estimated costs submitted with the proposal. This approval relates to the accounting treatment accorded the costs of your programs only, and nothing contained herein should be construed to approve activities not otherwise authorized by approved program plans, or Federal legislation or regulations.*

(Emphasis added). The Cost Allocation Plan was formally approved by letter of October 24, 1980, but this second letter contained no such proviso as that quoted above. Pursuant to this Cost Allocation Plan, Oregon made its claim.

The State of Oregon argues that it relied on the approval of the Cost Allocation Plan, which shifted the disputed costs to Title IV-A, and therefore that DHHS should be estopped from now disallowing claims made pursuant to that plan. The key to this issue is the effect of the approval of the Cost Allocation Plan and the effect of the disclaimer language of the 1979 letter. The DHHS argues that approval of a state Cost Allocation Plan does not mean that the agency must approve all requests for FFP made under that plan, and that the proviso in the 1979 letter put the State of Oregon on notice. The DHHS draws a distinction between approval of "allocation" of costs to Title IV-A activities and "allowability" of FFP for costs under Title IV-A law and regulations. Approval of the plan was based on a review of its accounting methodology, the DHHS contends, and not because it had been determined as a matter of law that all costs were allowable to the particular program to which the State of Oregon had charged them. However, it appears that DHHS approved the State of Oregon's plan because it believed at the time that the allocation of costs to Title IV-A was correct, or alternatively that it did not consider whether the allocation was correct or not. It is also questionable as to what the proviso in the 1979 letter means.

Once again, the scope of review this court may give the Board's decision is an issue. The DHHS contends that the Board's decision that DHHS should not be estopped is a factual determination subject to being set aside only if found to to "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law" or

**12**

"unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) & (E). The State of Oregon does not directly address the issue, but seems to assume that this court may reexamine the issue *de novo* as a question of law.

Even accepting the factual findings of the Board as true, this court may still examine whether the Board applied the proper legal standards for estoppel in light of those facts. It is clear from reading the Board's decision that the Board did not expressly apply the law of estoppel as that law has been developed by the Ninth Circuit. Therefore, the court will examine the Board's factual findings in light of this law.

In a series of cases culminating in *Miranda v. INS*, 673 F.2d 1105 (9th Cir.1982), *rev'd* 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *see also United States v. Ruby Co.*, 588 F.2d 697 (9th Cir.1978), *cert. denied* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), *Santiago v. INS*, 526 F.2d 488 (9th Cir.1975), *cert. denied* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir.1973), the Ninth Circuit has indicated that, although it is disfavored, equitable estoppel may be pressed against the government "where justice and fair play require it." *Lazy FC Ranch, supra*, 481 F.2d at 988. The necessary elements of such an estoppel are: (1) that the ordinary elements of estoppel be present, and in addition (2) that "the governmental conduct complained of amounts to 'affirmative misconduct.'" *Ruby Co., supra*, 588 F.2d at 703. The Ninth Circuit summarized these elements as follows:

(1) The party to be estopped must know the facts;

(2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) The latter must be ignorant of the true facts; and

(4) He must rely on the former's conduct to his injury.

[Citations omitted].

However, in this case the formulation of the necessary elements of estoppel must be modified in light of the "affirmative misconduct" limitation expressed in *Santiago*. As a result, the elements must be read as requiring an affirmative misrepresentation or affirmative concealment of a material fact by the government. *Cf. United States v. 31.43 Acres of Land*, 547 F.2d 479, 482 (9th Cir.1976); *United States v. Wharton*, [514 F.2d 406 at 412 (9th Cir.1975)].

*Id.* at 703–04.

Under this standard, the DHHS may not be estopped. Although the State of Oregon argues that the approval of its plan constituted "wrongful conduct" because DHHS erroneously approved the allocation of the disputed expenses under Title IV–A, this does not constitute affirmative misconduct of the sort necessary to subject the government to estoppel. As frustrating as it must be for a state to deal with obscure and nebulous legislation and equally obscure and nebulous agency regulations based on that legislation, and notwithstanding the fact that Congress and DHHS have left the State of Oregon with an indebtedness of $1,715,246 it otherwise might not have incurred had it not relied on DHHS's actions, the "affirmative misconduct" requirement of the Ninth Circuit bars recovery. At most, DHHS's representation to the State that the disputed expenses would receive FFP under Title IV–A (if indeed approval constituted such a representation; the Board found that it did not) was more in the nature of negligence than affirmative misconduct. *Cf. Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).

IT IS ORDERED that the decision of the Board is AFFIRMED.