**Sergeant Perry WATKINS, Plaintiff,**

v.

**UNITED STATES ARMY, et al., Defendants.**

**No. C81–1065R.**

United States District Court, W.D. Washington.

Oct. 5, 1982.

Opinion on Renewed Motion for Summary Judgment Oct. 28, 1982.

James E. Lobenz, American Civil Liberties Union of Washington, Seattle, Wash., for plaintiff.

Stanley E. Alderson, Dept. of Justice, Washington, D.C., Christopher L. Pickrell, Asst. U.S. Atty., Seattle, Wash., for defendants.

## MEMORANDUM OPINION AND ORDER

ROTHSTEIN, District Judge.

THIS MATTER is before the court on the parties' cross motions for summary judgment. At issue is whether the United States Army may deny reenlistment to plaintiff based on plaintiff's admitted homosexuality. On May 18, 1982 the court ruled that the Army could not, under its own regulations, validly discharge plaintiff on grounds of homosexuality. 541 F.Supp. 249. The undisputed facts that provided the foundation for that ruling are also controlling here:

On August 27, 1967 plaintiff reported to an Army facility for his preinduction physical examination. On a Report of Medical History plaintiff checked the box "YES" indicating that he then had homosexual tendencies or had experienced homosexual tendencies in the past. Transcript of Proceedings Before Administrative Discharge Board, October 28 & 29, 1981 (Tr.) at Inclosure 7. A psychiatrist evaluated plaintiff and found him "qualified for admission." *Id.* Following induction and training, plaintiff served in the United States and Korea as a chaplain's assistant, personnel specialist, and company clerk. Defendants' Memorandum in Support of Motion for Summary Judgment on Discharge Issue, at 3. While at Fort Belvoir, Virginia in November 1968, plaintiff stated to an Army Criminal Investigation Division agent that he had been homosexual since the age of 13 and had engaged in homosexual relations with two servicemen. Tr. at Inclosure 9. The investigation of plaintiff for committing sodomy, a criminal offense under Article 125 of the Uniform Code of Military Justice, was dropped because of insufficient evidence. Tr. at Inclosure 10, at 2. Plaintiff received an honorable discharge from the Army on May 8, 1970 at the conclusion of his tour of duty. Official Military Personnel File at 47. His reenlistment eligibility code was listed as "unknown." *Id.*

In May 1971 plaintiff requested correction of the reenlistment designation in his release papers, and on June 3 the Army notified him that his reenlistment code had been corrected to category 1, "eligible for reentry on active duty." *Id.* at 48. On June 18 plaintiff reenlisted for a period of three years. *Id.* at 56. During the fall of 1971, with the permission of the acting commanding officer of his unit, plaintiff performed an entertainment act as a female impersonator before the troops at a celebration of Organization Day for the 56th Brigade. Amended Complaint ¶ 19. Plaintiff's performance was reported in the December 1, 1971 issue of *Army Times,* a publication distributed to Army personnel worldwide. *Id.* ¶ 20. In the spring of 1972, plaintiff performed as a female imperson-

ator at the Volks Festival in Berlin, West Germany, with the express permission of his commanding officer. *Id.* ¶ 22. In January 1972 plaintiff was denied a security clearance based on his November 1968 statements concerning his homosexuality. Military Intelligence File at 22.

Following an honorable discharge on March 21, 1974, plaintiff reenlisted for six years and was subsequently reassigned to South Korea as a company clerk. Official Military Personnel File at 65. In October 1975 plaintiff's commander initiated elimination proceedings against plaintiff for unsuitability due to homosexuality pursuant to AR 635–200, Chapter 13. On October 14, 1975 a four member board convened at Camp Mercer, South Korea and heard testimony indicating that plaintiff was homosexual. Military Intelligence File at 84. Captain Albert J. Bast III testified that as plaintiff's commander he had discovered, through a background records check, that plaintiff had a history of homosexual tendencies. When Bast asked plaintiff about it, plaintiff stated that he was homosexual. *Id.* at 85. Bast testified further that plaintiff was "the best clerk I have known," and that plaintiff's homosexuality did not affect the company. *Id.* First Sergeant Owen Johnson testified that everyone in the company knew that plaintiff was homosexual and that plaintiff's homosexuality had not caused any problems or elicited any complaints. *Id.* at 86. The board made the following unanimous finding: "SP5 Perry J. Watkins is suitable for retention in the military service." *Id.* at 87. The board's recommendation was that plaintiff "be retained in the military service," and that plaintiff was "suited for duty in administrative positions and progression through Specialist rating." *Id.* The board's recommendation became the final decision of the Secretary. Defendant's Memorandum on Discharge Issue, at 6.

Following an assignment in the United States as a unit clerk, plaintiff was reassigned to Germany, where he served as a clerk and a personnel specialist with the 5th United States Army Artillery Group. In November 1977 the commander of the 5th

USAAG granted plaintiff a security clearance for information classified as "Secret." *Id.* at 14. Thereafter plaintiff applied for a position in the Nuclear Surety Personnel Reliability Program, which required an applicant to have a security clearance for information classified as "Secret" and to pass a background investigation check. Amended Complaint ¶ 28. Plaintiff was initially informed that, because his medical records showed he had homosexual tendencies, he was ineligible for a position in the program. Defendants' Memorandum at 5 n. 1; Amended Complaint ¶ 29. Plaintiff appealed. *Id.* ¶ 30. In support of his appeal plaintiff's commanding officer, Captain Dale E. Pastian, requested that plaintiff be requalified because plaintiff had been medically cleared, because of plaintiff's "outstanding professional attitude, integrity, and suitability for assignment" in the program, and because the 1975 Chapter 13 board recommended that plaintiff be retained and be allowed to progress in the military. Military Intelligence File at 68. Examining physician Lieutenant Colonel J.C. De Tata, M.D., concluded that plaintiff's homosexuality appeared to cause no problems in his work and noted that plaintiff had been through a Chapter 13 board "with positive results." *Id.* at 70. The decision to deny plaintiff's eligibility for the Nuclear Surety Program was reversed and plaintiff was accepted into the program in July 1978. *Id.* at 64.

On October 26, 1979 plaintiff was permitted to reenlist for a three year term. By letter dated December 18, 1979 the commander of the U.S. Army Personnel Clearance Facility notified plaintiff of the Army's intent to revoke his security clearance. *Id.* at 12. The letter stated that revocation was being sought "because during an interview on 15 March 1979, you stated that you have been a homosexual for the past 15 to 20 years." *Id.* Plaintiff submitted a rebuttal letter on May 29, 1980 admitting making that statement. *Id.* at 8. The commanding officer of the Central Security Facility revoked plaintiff's security clearance by letter dated July 10, 1980. *Id.* at 6.

In February 1981 plaintiff appealed the revocation to the Office of the Assistant Chief of Staff for Intelligence. Amended Complaint, Exhibit J–2. The Assistant Chief of Staff's Office stayed action on plaintiff's appeal pending the determination whether separation proceedings under Chapter 15 would be commenced. Declaration of Ronald W. Morgan, filed April 12, 1982. Plaintiff brought this action on August 31, 1981 challenging the revocation of his security clearance because he had admitted to being homosexual and seeking to prevent his discharge from the Army for homosexuality.

Separation proceedings were commenced under Chapter 15. An administrative discharge board recommended, 2–1, that plaintiff be given an honorable discharge, and plaintiff's commanding officer approved that recommendation. The court ruled that the Army's administrative double jeopardy provision precluded plaintiff's discharge on grounds that he had admitted to being homosexual. The court also ordered briefing on the reenlistment issue, which had been raised by the pleadings.

The Army maintains that plaintiff's reenlistment claim lacks merit because (1) the Army's decision to deny reenlistment is not subject to judicial review; (2) plaintiff's claim is one of promissory estoppel and therefore barred against the United States; (3) even if viewed as an equitable estoppel claim, plaintiff's claim must be barred because the United States acts in its sovereign capacity when it reenlists soldiers; and (4) the facts of this case do not support an equitable estoppel claim against the United States.

## I. JUDICIAL REVIEW

The court does not agree that judicial review is inappropriate. Plaintiff alleges that denial of reenlistment based on his admitted homosexuality violates the Constitution, and that military regulations should not be applied so as to deny him reenlistment.

■ Plaintiff has exhausted effective intraservice remedies. On July 26, 1982 plaintiff submitted a timely application for reenlistment to his commanding officer, Captain Rodger L. Scott. Captain Scott requested an interview with plaintiff pursuant to Army procedures. Since plaintiff's counsel was unable to be present on the date set for the interview, counsel instructed plaintiff to refuse to answer questions concerning this lawsuit. See Affidavit of Jim Lobsenz (filed Sept. 14, 1982); Declaration of Captain Rodger L. Scott (filed Sept. 13, 1982); Declaration of Captain Russell D. Johnson (filed Sept. 24, 1982). Plaintiff's counsel did not indicate that plaintiff would refuse to answer questions at an interview at which counsel could be present. See Affs. of Jim Lobsenz (Sept. 14, 1982; Sept. 30, 1982). No such interview has yet occurred. Captain Scott denied plaintiff's reenlistment request on July 28, 1982 for the following reasons:

Because of self admitted homosexuality as well as homosexual acts and his refusal to answer questions concerning his homosexuality or homosexual acts.

Attachment A to Lobsenz Aff. (filed Sept. 14, 1982). Captain Scott's finding that plaintiff has refused to answer questions is totally unsupported by the evidence and cannot stand. See Sanford v. United States, 399 F.2d 693, 694 (9th Cir.1968) (per curiam); Hodges v. Callaway, 499 F.2d 417, 423 (5th Cir.1974); 5 U.S.C. § 706(2)(A), (D). See Declarations of Captain Russell D. Johnson (filed Sept. 24, 1982); Affidavit of Jim Lobsenz (filed Sept. 30, 1982). Plaintiff's admitted homosexuality is the only ground for denial of reenlistment upon which the court will exercise review at this time.

■ Further applications for reenlistment within the Army would clearly be fruitless. The Army's position, asserted in pleadings submitted in this case, is that plaintiff is ineligible for reenlistment due to a nonwaivable disqualification. The Army does not maintain that plaintiff stands any chance of receiving a favorable disposition if he pursues intraservice remedies at this point: any officer acting on a request by plaintiff for reenlistment would have a

duty to deny it. This court will not require plaintiff to exhaust futile remedies.

■ The nature of plaintiff's claim has been described: it is an appeal to the equity powers of this court. And plaintiff's claim is strong from an equitable standpoint, as will be discussed in detail below. If review is refused the injury to plaintiff could be quite serious. Plaintiff has made the Army his career by investing fourteen years toward developing and refining skills necessary for military employment. The immediate harm to plaintiff if review is refused would be the loss of his job. Other effects would be the loss of a fourteen year investment toward retirement benefits, as well as the necessity for retraining in order to qualify for civilian employment. Judicial review obviously will not in itself prevent these events from occurring. It will, however, insure that they not occur impermissibly or unjustly. Moreover, while the court does not find it necessary to rule on plaintiff's constitutional arguments, those arguments cannot fairly be characterized as frivolous. Plaintiff certainly has an interest in having an Article III court independently review those claims.

There is necessarily some interference with military functions whenever a non-military tribunal reviews military action. What this court must be sensitive to is a degree of interference unwarranted by the need for review. Many cases will arise in which the balance is struck in favor of abstention, but this is not such a case. First, according to defendants, military discretion and expertise was not involved in the denial of plaintiff's request for reenlistment. The decision was automatic. Second, the court's examination of the Army's reenlistment decision concerning a single servicemember can cause very little disruption of the overall military function. Defendants' contention that the floodgates will be opened to exotic claims by other servicemembers is unpersuasive. The facts demonstrate the uniqueness of plaintiff's case.

The prerequisites for judicial review established by *Wallace v. Chappell*, 661 F.2d 729 (9th Cir.1981), have been satisfied here.

## II. PROMISSORY ESTOPPEL

Defendants characterize plaintiff's claim as one for promissory estoppel, arguing strenuously that plaintiff is trying to use estoppel to create a right to reenlist, rather than as a shield against a defense raised by the Army. So characterized, they contend that plaintiff's claim does not lie against the United States. *See Jablon v. United States,* 657 F.2d 1064, 1069–70 (9th Cir. 1981). "[P]romissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have . . . ." *Id.* at 1068.

■ The court does not read plaintiff's request so broadly. Plaintiff's argument is not that he has a right to reenlist. His argument is that the Army cannot deny him reenlistment because of his homosexuality. He asserts that, but for the Army's reliance on the military regulation making homosexuality a "nonwaivable disqualification," he is eligible for reenlistment. Accordingly, plaintiff seeks to estop defendants from relying on the regulation as a *bar* to his eligibility for reenlistment. Promissory estoppel is not a part of this case.

■ Defendants note in passing that Army Regulation (AR) 601–280, ¶ 1–6a permits the Secretary to deny reenlistment to "anyone, including those who otherwise meet the criteria specified in this regulation." The Army clearly has not relied on this regulation in denying plaintiff reenlistment. It has relied on plaintiff's admitted homosexuality, as the record reflects. A denial of reenlistment at this point for "no reason" would therefore lack any foundation.

## III. SOVEREIGNTY

Defendants argue next that equitable estoppel cannot be asserted against the United States when it acts in its sovereign capacity. In this court's opinion, the Ninth Circuit has not endorsed any such per se rule.

Defendants rely on *Saulque v. United States,* 663 F.2d 968 (9th Cir.1981). In that case the Secretary of the Interior denied an Indian's application for an allotment of a parcel of land under the Indian Allotment Act, finding that the land would not support the applicant's family, as required by the Act. The Indian's suit against the Secretary was dismissed by the district court. The court of appeals affirmed, holding that the Secretary's determination was supported by substantial evidence and that estoppel would not lie against the government. In rejecting the estoppel claim, the court decided that (1) a 1913 letter from a "low-level officer of the Department" concerning the suitability of the land for allotment was not the act of the Secretary and therefore could not bind the government; (2) the Department's mistake in granting an allotment of similar land in the same area to another individual could not bind the government and require that it perpetuate its error; and (3) a statement in a letter to the plaintiff from the Department's Area Realty officer that the land was allocable could not bind the government because the officer lacked authority, because the plaintiff knew that the officer's statement was not binding on the Department, and because in denying plaintiff's application the government was acting in its sovereign capacity.

It is apparent from the opinion in *Saulque* that the issue whether the United States was acting in its sovereign capacity was unnecessary to the decision. The controlling facts were that the agents who had made representations to plaintiff lacked authority and that plaintiff did not in fact rely on their representations. Moreover, *Saulque* must be read in the light of prior case law in this circuit. In *United States v. Lazy FC Ranch,* 481 F.2d 985 (9th Cir.1973), the court stated:

This proposition [that equitable estoppel can be asserted against the government] is true even if the government is acting in a capacity that has traditionally been described as sovereign (as distinguished from proprietary) although we may be more reluctant to estop the government when it is acting in this capacity.

*Id.* at 989 (citing same case cited by court in *Saulque*) (footnote omitted).

Similarly, in *Santiago v. INS,* 526 F.2d 488 (9th Cir.1975) (en banc), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), Judge Choy, concurring and dissenting, said:

We have not rested our decisions on whether we categorized acts as proprietary or sovereign, however; we have simply recognized that protection of the public welfare and deference to congressional desires is much more apt to outweigh hardships to private individuals in the equitable balance when estoppel is asserted against sovereign acts.

*Id.* at 496 (citations omitted). And in *United States v. Ruby Co.,* 588 F.2d 697 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), a panel composed of judges that had not joined Judge Choy's concurring and dissenting opinion in *Santiago* stated simply: "[E]stoppel may be applied against the government even when acting in its sovereign capacity." *Id.* at 703 (citation omitted).

■ The court simply cannot believe that *Saulque* was intended to overrule—sub silentio—this recognized body of authority. Rather, the indication in *Saulque* that the government was acting in a sovereign capacity must be read as another factor that the court considered. That the military function is a sovereign function, therefore, does not in itself bar plaintiff's claim.

### IV. EQUITABLE ESTOPPEL

■ The question here is whether the elements of equitable estoppel are present. Those are:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Lavin v. Marsh,* 644 F.2d 1378, 1382 (9th Cir.1981) (citation omitted). In addition, because the estoppel is asserted against the government, the plaintiff must show " 'affirmative misconduct' as opposed to mere failure to inform or assist." *Id.* (citation omitted).

### 1. Did the Army Know the Facts?

■ At his preinduction physical examination in August 1967 plaintiff checked the box on his medical history chart indicating that he had homosexual tendencies. The examining psychiatrist apparently did not believe plaintiff and designated plaintiff as qualified for admission. In November 1968 plaintiff admitted his homosexuality to an Army Criminal Investigation Division agent. Plaintiff was honorably discharged in May 1970 and his reenlistment code was listed as "unknown." Plaintiff requested correction of that code. The Army reclassified plaintiff as eligible for reentry on active duty, and in June 1971 plaintiff reenlisted for three years. In January 1972 plaintiff was denied a security clearance based on his 1968 admission of homosexuality. After another honorable discharge, in March 1974 plaintiff reenlisted for a six year term. In 1975 plaintiff's commander initiated discharge proceedings against plaintiff for unsuitability due to homosexuality. A four member board composed of a Major, two Captains and a First Lieutenant heard testimony establishing that plaintiff was homosexual. Plaintiff's commander, Captain Albert J. Bast III testified that plaintiff, who had told Bast he was homosexual, was "the best clerk I have known." First Sergeant Owen Johnson testified that everyone in the company knew plaintiff was homosexual and that plaintiff's homosexuality had not caused any problems. As noted earlier, the board recommended retention. In November 1977 plaintiff was granted a security clearance for information classified as "Secret." Plaintiff then applied for a position in the Nuclear Surety Personnel Reliability Program. Plaintiff was initially rejected because his medical records reflected his homosexuality. Plaintiff appealed. His commanding officer,

Captain Dale E. Pastian, wrote in support of plaintiff's appeal, requesting that plaintiff be requalified notwithstanding plaintiff's record. An examining physician concluded that plaintiff's homosexuality caused no problems in his work. The Army requalified plaintiff for admission into the Program in July 1978. In October 1979 plaintiff reenlisted for three years.

Defendants' position, asserted in their brief and at the hearing on these motions, that Army personnel responsible for plaintiff's enlistment and reenlistments did not know that plaintiff was homosexual, is patently absurd. All of the events described above are documented in plaintiff's official Army files. For the Army to acknowledge that it is aware of plaintiff's homosexuality when it comes to conducting criminal investigations, holding discharge proceedings, and revoking security clearances, but maintain that it is ignorant when four enlistments are at issue, suggests bad faith. *See* Fed.R.Civ.P. 11. The Deputy Chief of Staff for Personnel, primarily responsible for Army reenlistment, *see* AR 601–280, ¶ 1–7.1 *a,* cannot be deemed unaware of the contents of plaintiff's personnel file.

### 2. Did the Army Intend that Plaintiff Act in Reliance on its Conduct, or Did the Army so Act that Plaintiff Had a Right to Think the Army so Intended?

#### a. What was the Army's conduct?

Plaintiff was admitted into the Army after stating under oath that he had homosexual tendencies. Plaintiff was honorably discharged in 1970. Plaintiff requested reclassification of his reenlistment code since it had been designated as "unknown" at the time of plaintiff's discharge, and the Army reclassified plaintiff as "eligible for reentry." This reclassification occurred even though plaintiff admitted to an Army Criminal Investigation Division agent in 1968 that he had been homosexual since age 13 and had engaged in relations with two servicemen. The Army reenlisted plaintiff for a three year period in 1971 and honorably discharged him in 1974. Plaintiff was then

permitted to reenlist for a six year term. In 1975 a four member administrative board recommended that plaintiff be retained in the Army and be allowed to progress despite uncontradicted evidence that plaintiff was homosexual, and its recommendation became the final decision of the Army. In 1978 plaintiff was accepted into the Nuclear Surety Personnel Reliability Program despite his admitted homosexuality. In 1979 plaintiff was reenlisted for another three year period. This is the conduct of the Army that is relevant to plaintiff's estoppel claim.

### b. Did the Army's conduct amount to "affirmative misconduct"?

██ "Affirmative misconduct," an essential element of plaintiff's claim, must be determined on a case-by-case basis. *Lavin v. Marsh,* 657 F.2d at 1382–83 n. 6. However, some general principles can be isolated. It is not necessary that government agents intend to mislead a party. *Jablon v. United States,* 644 F.2d at 1067 n. 5. "Affirmative misconduct for equitable estoppel purposes can be present when the government acted (gave incorrect information, e.g.) rather than failed to act (failed to warn someone that his or her conduct is illegal)." *Id.* (citations omitted).

██ Affirmative misconduct breaks down into two components. There must be misfeasance, as opposed to nonfeasance, although these are "slippery terms." *Santiago v. INS,* 526 F.2d at 493. And the act done must be within the scope of the actor's authority. *Saulque v. United States,* 663 F.2d at 974 (citation omitted). It is well settled that the government is not bound by the *unauthorized* acts of its agents. *See Federal Crop Insurance Co. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

██ Here it is plain that Army officers acted "affirmatively" in admitting, reclassifying, reenlisting, retaining and promoting plaintiff. This conduct cannot be characterized as a "mere failure to inform or assist." *Lavin v. Marsh,* 644 F.2d at 1382. The Army did not stand aside while plaintiff reenlisted or accepted a promotion. It gave plaintiff those privileges. The facts here are as extreme as those in *United States v. Wharton,* 514 F.2d 406 (9th Cir. 1975), where the court did not hesitate to estop the government from disavowing its misconduct. Without Army approval plaintiff would not have been able to enter; remain or progress in the Army. The defendants point out that reenlistment is exclusively the Secretary's function. Here he exercised his authority three times.

██ It is also plain that the conduct under consideration, while contrary to regulations, was well within the scope of authority of the officers that performed it. Plaintiff's induction was handled by an induction officer, his reclassification and reenlistments by officials with reenlistment authority, the Chapter 13 proceeding by a duly constituted board of officers, and his admission into the Nuclear Surety Program by the Adjutant General. This is undisputed. To satisfy the element of affirmative misconduct the court need look no further.

### c. Was the Army's conduct intended to induce reliance, or was it such that plaintiff had a right to think it was so intended?

Whether the affirmative acts under consideration were intended to be relied on by plaintiff as an indication that his homosexuality would not bar a military career is a question of fact. Plaintiff has not offered any evidence to prove that they were.[1] Plaintiff has instead urged the court to conclude, as a matter of law, that the affirmative acts were such that plaintiff had a right to think they were intended to be relied upon.

Taken individually, the acts of Army officers in enlisting plaintiff, reenlisting plaintiff, recommending plaintiff for retention

---

1. Defendants have offered only argument, not evidence, as proof that no Army officer with knowledge of plaintiff's homosexuality intend-

ed to induce plaintiff to believe he could enjoy a military career. *See* Defendants' Memorandum on Issue of Reenlistment, at 9–12.

in the military, and promoting plaintiff to a sensitive position in the Nuclear Surety Program cannot be viewed otherwise than as commitments by plaintiff and the Army for the periods covered. Had plaintiff failed to report for duty, or deserted his post, or disobeyed his commanding officer, the Army could have instituted proceedings against him. *See* Arts. 85, 90 & 92, Uniform Code of Military Justice, 10 U.S.C. ·§§ 885, 890, 892. By the same token, the Army made a commitment to plaintiff to pay him and to permit him to serve during each of the enlistment and reenlistment periods. Had the Army failed to pay plaintiff or disallowed plaintiff from serving, plaintiff just as certainly could have sought enforcement of the Army's obligations. *See* 37 U.S.C. § 204; *Bell v. United States,* 366 U.S. 393, 401–04, 81 S.Ct. 1230, 1235–36, 6 L.Ed.2d 365 (1961). The court does not hear the Army to argue that Sgt. Watkins was bound by his contracts with the Army but that the Army was not also bound.

The Army's position, rather, is that even though responsible Army officers decided to enlist, reenlist, retain and promote plaintiff, plaintiff had no right to expect that those privileges would continue to be extended. In essence, the Army contends that plaintiff assumed the risk that his Army career would be discontinued at any time based on his homosexuality. The court cannot agree.

Plaintiff declared his homosexuality to the Army from the very beginning, and even if he was not believed at first, doubt that he was in fact homosexual was resolved in 1968 when plaintiff admitted to engaging in relations with other servicemen. Plaintiff was candid with the Army about his homosexuality; that factor is central to this case.

■ Clearly the decision to enlist or reenlist a soldier is not a casual decision. *See, e.g.,* AR 601–210, ¶ 1–6a; AR 601–280, ¶ 1–7. An applicant must be processed to "ensure" that he or she meets the requirements. *Id.* ¶ 2–2. Likewise, the decision of an administrative board of officers, convened specially to determine whether a particular soldier should be separated due to homosexuality, is a well-considered decision. And granting a servicemember a position in the Nuclear Surety Program, which requires a "Secret" security clearance and a background investigation check, is again a serious decision by the military.

On each of many occasions the Army told plaintiff his homosexuality was *not* disqualifying. This is the essence of plaintiff's estoppel claim. Plaintiff had a right to think he could make the Army his career because the Army told him so. Were the court unwilling to recognize the legitimacy of plaintiff's expectation of continued military service, a "profound, unconscionable injury" to plaintiff would surely result. *See United States v. Lazy FC Ranch,* 481 F.2d at 988.

Taken individually, as stated before, the Army's acts generated enforceable expectations on plaintiff's part. Taken together, over a career spanning more than 14 years, those acts amounted almost to a policy of ignoring this servicemember's homosexuality. As a matter of law, the court concludes that the second element of plaintiff's estoppel claim has been satisfied.

### 3. Was Plaintiff Ignorant of the "True Facts"?

■ The "true fact" here is that homosexuality is a nonwaivable disqualification for reenlistment to which Headquarters, Department of the Army, cannot grant exceptions. *See* AR 601–280, ¶¶ 1–2b, 2–24c. Nothing in the record suggests that plaintiff knew homosexuality was a nonwaivable disqualification for reenlistment. But even if plaintiff knew that it was, there is nothing to indicate that he knew no exceptions could be granted. Plaintiff's experience was clearly otherwise. Any doubts plaintiff may have had as to whether the Army would permit him to reenlist were dispelled in 1970, when the Army "corrected" his reenlistment code and signed a three year contract with him. Had plaintiff known the true facts, it is highly unlikely that he would have invested twelve additional years in the Army. The court is satisfied that plaintiff was ignorant of the current position of the Army.

### 4. Did Plaintiff Rely to His Injury on the Army's Conduct Concerning His Homosexuality?

Tied up in litigation, less than six years from retirement, having invested a total of more than 14 years in the Army, it is not difficult to see that plaintiff has relied to his injury on the many "green lights" he received from Army representatives. Plaintiff developed skills necessary for military employment and refrained from developing skills suitable for civilian jobs. He worked more than 14 years toward a retirement benefit that he could have sought elsewhere. Had the Army refused plaintiff reenlistment in the past, plaintiff would not have lost the opportunities for civilian employment that would have brought him to a point of equivalent achievement.

The injury to plaintiff from having relied on the Army's approval of his military career—and being denied it now—is the loss of his career. The harm to the public interest if reenlistment is not prevented is nonexistent. Plaintiff has demonstrated that he is an excellent soldier. His contribution to this Nation's security is of obvious benefit to the public. Furthermore, when the government deals "carefully, honestly and fairly with its citizens," *United States v. Wharton,* 514 F.2d at 413 (footnote omitted), the public interest is likewise benefited.

### ORDER

1. Defendants are estopped from relying on AR 601–280, ¶ 2–24c as a bar to plaintiff's reenlistment. Defendants must process plaintiff's request for reenlistment as if that regulation did not exist.

2. The court declines to order briefing on the propriety of the revocation of plaintiff's security clearance. Plaintiff's appeal from that revocation is still pending before the Assistant Chief of Staff for Intelligence. Judicial review of the matter would therefore be inappropriate at this time.

3. The court retains jurisdiction over the instant parties and dispute pending final disposition of plaintiff's request for reenlistment. Counsel are directed to keep the court informed in this regard.

IT IS SO ORDERED.

The Clerk of the Court is directed to forward copies of this Memorandum and Order to counsel of record.

### ON RENEWED MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the court on defendants' Renewed Motion for Summary Judgment on the issue of reenlistment. On October 5, 1982 the court ordered defendants to consider plaintiff's reenlistment application without regard to the Army regulation making homosexuality a nonwaivable disqualification. Plaintiff's reenlistment application had been denied on the basis of plaintiff's "self admitted homosexuality as well as homosexual acts and his refusal to answer questions concerning his homosexuality or homosexual acts." Because there was insufficient evidence that plaintiff had refused to answer questions, the court did not review that asserted basis for denying reenlistment.

On October 5 the Army conducted a Hearing Relating to the Reenlistment Application of Staff Sergeant Perry J. Watkins at Fort Lewis, Washington. A transcript of the hearing is attached to this Order as Exhibit A. Sergeant Watkins was present with counsel. After advising plaintiff of his right to remain silent, Company Commander Captain Thomas Landwermeyer questioned plaintiff broadly about plaintiff's past, present and future sexual practices and inclinations. Plaintiff declined to answer and raised specific objections to each question. Defendants now argue that plaintiff's refusal to state whether he committed homosexual acts during his current term of enlistment and whether he intends to commit such acts in the future provides an "independent and conclusive basis" for denying reenlistment. Defendants say that the Army has a legitimate interest in considering plaintiff's intention to commit future unlawful acts in determining whether to permit reenlistment.

Defendants' approach would negate the effect of the court's October 5 Order. Homosexuality and homosexual acts have been unlawful during plaintiff's entire career, yet the Army never used them to bar plaintiff's reenlistment. Since 1968 the Army has known that plaintiff engaged in relations with other servicemen. Notwithstanding its knowledge of plaintiff's sexual preference it encouraged plaintiff's military career. The court's decision disabled the Army from reversing its position and using plaintiff's homosexuality as a bar to future military service.

The Army cannot now avoid the estoppel by characterizing homosexual acts as military crimes and by pretending to investigate such crimes. Not only is the attempt transparent, the consequences are unjust. The legal officer at the hearing indicated at the outset that the purpose of the "interview" was to determine Sergeant Watkins' qualifications for reenlistment. Transcript (Tr.) at 1. Captain Landwermeyer then proceeded to define certain terms pertinent to "the offense under investigation." Tr. at 2–3. After plaintiff's counsel demanded for the fifth time to be told what offense was under investigation, the following colloquy occurred:

> Mr. Lobsenz: Okay. Am I to understand that you have no information to support a suspicion that any particular offense has been committed?

> Captain Johnson: Well, no. The referenced boards and other statements made are the basis for Captain Landwermeyer's questioning.

Tr. at 4. The court's May 18, 1982 Order prevented the Army from basing plaintiff's discharge on facts that in 1975 had resulted in a decision to retain plaintiff. *Watkins v. United States Army*, 541 F.Supp. 249, 257–58 (W.D.Wash.1982). The October 5 Order prevented the Army from considering plaintiff's homosexuality in its reenlistment decision. From a reading of these two orders it should have been clear to defendants that a fishing expedition into matters aired before two discharge boards was foreclosed. The legal officer admitted that plaintiff was not suspected of any homosexual conduct that was not already known to the Army. Certainly no charges had been initiated against plaintiff. *See* ¶ 29a, Manual for Courts-Martial. The "investigation" simply allowed the Army to substantiate its allegation that plaintiff refused to answer questions.

That the Army's investigation into some hypothetical offense was not bona fide is further evidenced by the Army's flagrant disregard for procedural formalities. Prior to the "interview" no notice that an offense was under investigation was given to plaintiff. The interview itself was explained to plaintiff as intended to determine his qualifications for reenlistment; if an offense was really under investigation such a subterfuge would risk invalidating the interview. Similarly, if the questioners had been able to get plaintiff to waive his privilege against self-incrimination and answer their questions, under threat of the loss of his job, his answers would be inadmissible in any subsequent criminal prosecution. *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967). Moreover, penalizing plaintiff for refusing to answer questions, where the questioners failed to state for the record the subject under inquiry and the relevancy of the questions thereto, would trigger due process concerns. *Watkins v. United States*, 354 U.S. 178, 214–15, 77 S.Ct. 1173, 1193, 1 L.Ed.2d 1273 (1957). A genuine attempt to determine whether plaintiff should be held responsible for a particular offense would not be conducted in this manner.

Defendants rely on *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953), and *Clifford v. Shoultz*, 413 F.2d 868 (9th Cir.), *cert. denied*, 396 U.S. 962, 90 S.Ct. 426, 24 L.Ed.2d 426 (1969). Those cases are not controlling here. *Orloff* held that habeas corpus would not lie to compel the President to grant a commission or to review the duty assignment of a lawfully inducted soldier. The soldier had refused, on self-incrimination grounds, to say whether he was or had been a member of the Communist Party, and the commission sought would have stated that the President reposes "spe-

cial trust and confidence in the patriotism" of the soldier. *Shoultz* held that an individual's refusal to answer questions concerning his relationship with Cuban Communists, on grounds of constitutional privilege, justified the revocation of his "secret" security clearance. The court rejected the argument that the questions asked were irrelevant to Shoultz's fitness for continued access to national defense information.

In those cases the relationship between the questions asked and the privilege at issue was clear. Here, defendants have shown no relationship—aside from homosexuality, which was removed as a consideration by the court's October 5 Order—between the questions asked and plaintiff's qualifications for reenlistment. Since defendants are estopped from considering plaintiff's homosexuality as a bar to his reenlistment, they cannot use his refusal to answer questions concerning his homosexuality as a bar. Defendants' transparent effort to convert plaintiff's homosexuality into criminality by conducting an impromptu inquisition cannot be countenanced.

The court has never said and is not now saying that plaintiff has a right to commit acts that Congress has declared illegal. Nor has the court attempted to limit the Army's lawful authority to investigate and prosecute offenses occurring under its jurisdiction. Nor has the court stated that the Army cannot use homosexuality as a bar to the reenlistment of soldiers other than Sergeant Watkins. The court does hold, however, that the Army cannot, consistent with the court's October 5 Order, use plaintiff's homosexuality as an open door through which to probe for possible misconduct, when it has no grounds to believe such misconduct exists.

Defendants' Renewed Motion for Summary Judgment is DENIED. Pursuant to defendants' representation in their October 18 Report to the Court, defendants should now take final action on plaintiff's application, in accordance with this Order.

IT IS SO ORDERED.

The Clerk of the Court is directed to forward copies of this Order to counsel of record.

## EXHIBIT A

IN RE: Proceedings of Hearing Relating to the Reenlistment Application of Staff Sergeant Perry J. Watkins

Taken at Fort Lewis, Washington 98433, on 5 October 1982.

APPEARANCES:

Mr. James Lobsenz, counsel for Perry J. Watkins;

Captain Thomas Landwermeyer, Commander, HSC, 268th Aviation Battalion;

Captain Russell D. Johnson, Officer of the Staff Judge Advocate, 9th Infantry Division;

Staff Sergeant Perry J. Watkins, HSC, 268th Aviation Battalion.

*The following proceedings were had, to wit:*

CAPTAIN JOHNSON: I would like to note that this interview is conducted for the purpose of determining, if possible, the qualifications of Sergeant Watkins for reenlistment. At this time, Captain Landwermeyer is going to, for the record, advise him of his rights under Article 31, UCMJ. Captain Landwermeyer—

MR. LOBSENZ: Before you do that, I would like to ask for a clarification. You said that this is for the purpose of determining his qualifications for reenlistment? There has earlier been a denial of his application for reenlistment. So, are you stating then, that that rejection of his application for reenlistment has been withdrawn?

CAPTAIN JOHNSON: No, this is a proceeding to give Sergeant Watkins the opportunity to answer certain questions.

MR. LOBSENZ: He doesn't want the opportunity, particularly, and if the application denial hasn't been withdrawn, what is the purpose of this proceeding?

CAPTAIN JOHNSON: The denial was based on a previous attempt by the previous Company Commander, Cap-

tain Scott; and, my understanding is that, at a subsequent court proceeding there was some issue over whether he had been given a full and a fair opportunity to respond to those questions. That's the purpose now, of giving him that opportunity.

MR. LOBSENZ: Okay. Well, we will waive that opportunity.

CAPTAIN JOHNSON: Well, we would like to proceed and offer him a chance to answer those questions.

MR. LOBSENZ: I have to ask again, what is the purpose? If it has been denied and it is not being withdrawn, he can't possibly be reenlisted no matter what happens here today. According to you, you are saying you would like to give him the opportunity, and we are saying, "Thank you very much, but we don't need it."

CAPTAIN JOHNSON: I'm not saying that it hasn't—can't be withdrawn or denied. I don't—I'm not in a position either factually or authority wise to make a statement on that. I think that Captain Landwermeyer would like to proceed. Why don't you go ahead and read him those rights? Then we can cover that aspect. Captain Landwermeyer?

CAPTAIN LANDWERMEYER: Before I ask you any questions, I must understand your rights. (Reading from DA Form 3881.) You do not have to answer my questions or say anything. Anything you say or do can be used as evidence against you in a criminal trial. You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This can be a civilian arranged for at no expense to the government or a military lawyer detailed for you at no expense to you, or both. If you are now willing to discuss the offense under investigation, with or without a lawyer present, you have a right to stop answering questions at any time—

MR. LOBSENZ: I would like to ask what the offense is under investigation?

CAPTAIN JOHNSON: Okay. I would like to explain that. The two terms that we are going to be using are defined "homosexual acts" that term is defined in the Army regulation. I have that. I would like to read that definition out of the regulation so we all are aware—

MR. LOBSENZ: Is there an offense under investigation?

CAPTAIN JOHNSON: Okay. If you will let me read this definition? The questions that he desires to ask use this term "homosexual acts". "Homosexual acts" consist of bodily contact between persons of the same sex. Actively undertaken or passively permitted, with the intent of obtaining or giving sexual gratification, or any other proposal, solicitation, or attempt to perform such an act. Individuals who have been involved in such "homosexual acts" in an apparently isolated episode stemming solely from immaturity, curiosity, or intoxication, and in the absence of other evidence that the individual is a homosexual, normally will not be excluded from reenlistment. A "homosexual" is an individual, regardless of sex, who desires bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual gratification. Any official private or public profession of homosexuality may be considered as to determine whether an individual is an admitted homosexual.

The other term we are going to use in questioning that I would like to define is "sodomy". I am using Article 125 of the UCMJ to define that term. "Sodomy" is the engaging in unnatural carnal copulation, either with another person of the same or opposite sex or with an animal. Any penetration, however slight, is sufficient to complete the offense, and emission is not necessary. It is "unnatural carnal copulation" for a person to take into his or her mouth or anus the sexual organ of another person or of an animal; or to place his

or her sexual organ in the mouth or anus of another person or of an animal; or to have carnal copulation in any opening of the body, except the sexual parts, with another person; or to have carnal copulation in any opening of the body of an animal.

MR. LOBSENZ: What offense is under investigation?

CAPTAIN JOHNSON: Those two. "Homosexual acts" and "sodomy", and the information we have that he may be involved—

MR. LOBSENZ: Well, we had a Chapter 15 Discharge Board which was the second discharge board he's had. They investigated two alleged offenses—which—who is it that has alleged—what offense are you investigating today?

CAPTAIN JOHNSON: The questions that Captain Landwermeyer intends to ask are in general terms. They are not to a specific day or time.

MR. LOBSENZ: Okay. Am I to understand that you have no information to support a suspicion that any particular offense has been committed?

CAPTAIN JOHNSON: Well, no. The referenced boards and other statements made are the basis for Captain Landwermeyer's questioning.

MR. LOBSENZ: I would like to register a formal objection on the grounds that we have had a second discharge board and the United States District Court for the Western District of Washington has ruled that it was improper to hold that board, because it was the second board to investigate the same allegation which had been investigated six years earlier. As I understand it, I am now being told, that without any specific incident in question there is now being commenced a third investigation of the same general topic area. I believe that is prohibited, both by Army Regulations, and that it violates the existing court order.

Sorry to keep interrupting you, Captain Landwermeyer.

CAPTAIN JOHNSON: Well, I think if we let Captain Landwermeyer proceed here to ask these questions, it will become clear here that the questions concerned are his current qualifications for reenlistment.

CAPTAIN LANDWERMEYER: I need to complete—I will just start over with section d. If you are now willing to discuss the offense under investigation, with or without a lawyer present, you have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if you have signed a waiver certificate. Do you fully understand your rights?

SERGEANT WATKINS: Yes, sir.

CAPTAIN LANDWERMEYER: I see you have your lawyer with you at this time. At this time, are you willing to discuss the offense under investigation and make a statement without talking to a lawyer and without having a lawyer present?

MR. LOBSENZ: I advise him not to answer that question, because we have not been advised what the offense under investigation is. Without any particulars we can't possibly give a response as to what he is being questioned about— as to the investigation, since he hasn't told us what it is about.

CAPTAIN JOHNSON: Well, why don't we go ahead and proceed with the questions on a question by question basis. Sergeant Watkins, with the advise of counsel, can respond if he desires, or no response.

CAPTAIN LANDWERMEYER: (Handing form to SSG Watkins) I want you to read from there (indicating) down and then your signature here (indicating). (SSG Watkins and counsel perused document.)

MR. LOBSENZ: My advise to you is to write in the comment section here or the waiver section, or wherever they ask you to write, "I have not been advised as to the nature of the offense under investigation and cannot make a meaningful response."

CAPTAIN LANDWERMEYER: (To Captain Johnson) Do you have any particular box where you want him to put that?

CAPTAIN JOHNSON: In the comment section.

(SSG Watkins writing his comment.)

CAPTAIN JOHNSON: Just as an attempted point of clarification. The two terms that we defined earlier, "homosexual acts" and "sodomy", are offenses under the Uniform Code of Military Justice. And while the purpose of this interview is concerning qualifications for reenlistment, the rights warning—the standard rights warning procedure was used because of the fact that the questions will relate to conduct that is a criminal offense under the UCMJ.

(SSG Watkins handing form to counsel, in turn handing to Captain Landwermeyer.)

CAPTAIN LANDWERMEYER: Will we need his signature here, or here (indicating to Captain Johnson)?

CAPTAIN JOHNSON: Well, go ahead and ask the questions. See if he desires to respond.

CAPTAIN LANDWERMEYER: Okay. Have you ever engaged in homosexual acts or acts of sodomy?

MR. LOBSENZ: I think I'll have to confer with my client.

CAPTAIN JOHNSON: Okay. Just for the record, we will note that we are taking a break to allow Mr. Lobsenz and Sergeant Watkins to have a private conversation.

MR. LOBSENZ: Why don't you, before you go off the record, give me the entire text of that question?

CAPTAIN LANDWERMEYER: Have you ever engaged in homosexual acts or acts of sodomy?

(Hearing recessed. Mr. Lobsenz and Sergeant Watkins departed and returned momentarily.)

CAPTAIN JOHNSON: Okay. Just again to note that Sergeant Watkins and his attorney, Mr. Lobsenz, have returned to the room.

MR. LOBSENZ: My advise to my client, for the record, is not to answer that question for the following six reasons:

It is beyond the Army's authority to require matters of his entire life history, to include prior enlistments;

It's a violation of the Supreme Court's ruling concerning the scope of the Army's authority to inquire into past conduct;

It's also a violation of Regulation 601–280 which prohibits inquiry into the same areas of conduct as were previously inquired into at an unsuccessful Administrative Discharge Board;

It's a violation of Article, excuse me, I advised my client not to answer additionally on the grounds that he invoke his privilege to remain silent under Article 31; and, he invoke his privilege to remain silent under the Fifth Amendment;

It's a violation of his right to privacy under the First, Fourth, and Ninth Amendments; and last, sixth,

It's a violation of the Court order, that the Army has attempted to inquire into the same area which it previously inquired into in 1975 and again in 1981, and the Court has already determined that it was unlawful.

CAPTAIN LANDWERMEYER: Next question. Have you ever engaged in homosexual acts or acts of sodomy during your present term of enlistment?

MR. LOBSENZ: Well, whatever is necessary to do—interrupt this proceedings again. If you just give me a moment. It would be my advise to my client not to answer that question for all of the reasons except for the first one, which we answered earlier. This is in violation of Regulation 601–280, and I advise him to invoke his Article 31 and Fifth Amendment rights; and, it's a violation of his right to privacy under the First, Fourth, and Ninth Amendments; and, it's a violation of the Court order.

CAPTAIN LANDWERMEYER: Have you ever engaged in homosexual acts or acts of sodomy with other soldiers?

MR. LOBSENZ: I would object, and advise my client not to answer under all six grounds previously mentioned.

CAPTAIN LANDWERMEYER: Have you ever engaged in homosexual acts or acts of sodomy with other soldiers during your present term of enlistment?

MR. LOBSENZ: I advise my client to object to that on five grounds not including the first one concerning the scope of the Army's authority to inquire into prior periods of enlistment and pre-enlistment periods.

CAPTAIN LANDWERMEYER: Have you ever engaged in homosexual acts or acts of sodomy with other government employees?

MR. LOBSENZ: I advise my client to object on all six grounds previously mentioned.

CAPTAIN LANDWERMEYER: Have you ever engaged in homosexual acts or acts of sodomy with other government employees during your present term of enlistment?

MR. LOBSENZ: I advise my client to refuse to answer on the five grounds. All grounds previously mentioned except the scope of the Army's authority to inquire into past enlistment periods.

CAPTAIN LANDWERMEYER: Have you ever engaged in homosexual acts or acts of sodomy with any other person?

MR. LOBSENZ: I advise my client to refuse to answer on all six previously mentioned grounds.

CAPTAIN LANDWERMEYER: Have you ever engaged in homosexual acts or acts of sodomy with any other person during your present term of enlistment?

MR. LOBSENZ: I advise him not to answer for the five grounds previously mentioned, including all but the first.

CAPTAIN LANDWERMEYER: Do you now have a steady partner with whom you are engaging in homosexual acts or acts of sodomy on a continuing basis?

MR. LOBSENZ: I advise him not to answer for all the grounds previously mentioned except the first.

CAPTAIN LANDWERMEYER: Do you intend to engage in homosexual acts or acts of sodomy in the future?

MR. LOBSENZ: I think I'd like an opportunity to confer with my client on that question.

CAPTAIN JOHNSON: Let's just note for the record that we will take a break here and allow the private conversation.

MR. LOBSENZ: And you better give me the exact question again?

CAPTAIN LANDWERMEYER: Do you intend to engage in homosexual acts or acts of sodomy in the future?

(Hearing recessed. Mr. Lobsenz and Sergeant Watkins departed and returned momentarily.)

CAPTAIN JOHNSON: Again, just for the record, let me note that Mr. Lobsenz and Sergeant Watkins have returned.

MR. LOBSENZ: I have advised my client not to answer that question on the grounds of violation of 601–280, and advise him to rely on his Article 31 and Fifth Amendment privilege. While strenuously, for the record, I would advise him to rely on his right to privacy under the First, Fourth, and Ninth Amendments. And I wish to state, for the record, that it's precisely this kind of question which is totally unwarranted and unreasonable, intrusion into his privacy in the area of his personal life. I wish to point out for the record, that I do not believe that it is the regular practice of the United States Army, nor do I believe it to be constitutional for the Army to inquire of a man seeking reenlistment, or of a woman seeking reenlistment, what that persons intentions are for future actions. For example, concerning intentions in the future to engage in sex in return for payment of money, to commit adultery, to cohabit with a member of the opposite sex without being married and committing fornication, to commit any

particular act of sexual intercourse. I don't think any of those questions would be proper and I don't believe they are ever asked of anyone else, and I don't believe they are proper in this case.

CAPTAIN JOHNSON: At this point, of course, we are not here to debate any constitutional or other issues, but we will note your response in the record; but, again, I'd like to emphasize that Captain Landwermeyer is asking these questions to determine his eligibility for reenlistment.

MR. LOBSENZ: Well, he's asking these questions to determine his eligibility for reenlistment which has been denied, which you indicated initially was a denial, and then about other questioning you indicate that it's not necessarily over but you don't have the authority to indicate one way or the other whether that reenlistment has been denied or not. Then you proceed to advise him that we are concerned with an offense under investigation. So, it's not clear to me that we are asking these questions for the purpose of reenlistment. It seems to me that that decision has been made, and we're asking for the purpose of conducting a witch hunt to find out whatever you can possibly find out so that you can prove something that you failed to prove in October.

CAPTAIN JOHNSON: Okay.

MR. LOBSENZ: How many more questions are there?

CAPTAIN JOHNSON: There are just— What I wanted to say for the record was that we're not here to—we're not here—and it's not proper for me to debate any legal issues, but the rights were read, we just want to make sure and point out that failure to respond to these questions will certainly be a factor in Captain Landwermeyer, or the Army's ability to determine Sergeant Watkins' eligibility for reenlistment.

MR. LOBSENZ: Are you indicating that Captain Landwermeyer is now the person with the authority to determine whether or not to accept his application for reenlistment?

CAPTAIN JOHNSON: No. And to clarify my responses earlier, at the beginning of this session, I wasn't indicating a position either way. My only—My comments were intended to clarify the fact that I am not in a position to make any determinations of any of these issues.

MR. LOBSENZ: Then maybe I should ask Captain Landwermeyer, for the record, do you intend to make your own decision as to whether or not to approve an application for reenlistment?

CAPTAIN LANDWERMEYER: I can't answer that at this time.

CAPTAIN JOHNSON: As we tried to indicate earlier, the purpose of this interview was to give him a chance to answer questions. There was some issue of whether he was ever given this opportunity, and instead of further debating this issue, why don't we continue and finish answering the questions?

MR. LOBSENZ: I have to indicate for the record that an attorney must at all times raise appropriate legal objections or they are lost. So, I cannot agree with the position that this is not an appropriate place to discuss the constitutional issues.

CAPTAIN JOHNSON: Well, we will certainly note those objections, but we are not in a position to debate the appropriateness or constitutionality or whatever of any particular question.

MR. LOBSENZ: Well, I have a further question regarding his eligibility for reenlistment. He was initially advised that he submitted his application for reenlistment too early. At the same time a government attorney advised us that his application had not yet been submitted and why hadn't it been submitted? When it was submitted it was rejected for being submitted too early, and it was resubmitted and it was denied. And, I would like to ask whether or not it's the Army's position at this time that it is necessary for him to submit another application or not.

CAPTAIN JOHNSON: Well, I don't think anyone here has that information.

MR. LOBSENZ: If the Army is refusing to take a position as to whether or not he needs to file another application for reenlistment, then your action, Captain Johnson and Captain Landwermeyer, will, I believe, stop the Army from ever claiming that he failed to file another application. If you don't give us some information about whether you think another request is required now or not, we have no way of knowing whether the Army wants one.

CAPTAIN JOHNSON: Well, I think, we are noting your objections for the record and I would like to continue with the questions, and give him a chance to respond.

CAPTAIN LANDWERMEYER: Do you intend to engage in homosexual acts or acts of sodomy in the future with other soldiers?

MR. LOBSENZ: It's the same objections as to the last question, and I advise my client not to respond.

CAPTAIN LANDWERMEYER: Do you intend to engage in homosexual acts or acts of sodomy in the future with other government employees?

MR. LOBSENZ: The same objection as to the last two questions, and I advise my client not to respond.

CAPTAIN LANDWERMEYER: Do you intend to engage in homosexual acts or acts of sodomy in the future on a military post or installation?

MR. LOBSENZ: Same objections as to the last three questions.

CAPTAIN LANDWERMEYER: If reassigned, especially to a restricted area, do you intend to continue engaging in homosexual acts or acts of sodomy?

MR. LOBSENZ: I object to the assumption built into the question which says, "continue to engage," there has been no proof; and, I think the question is improper as to form as well as all previous objections the same as the last three questions.

CAPTAIN LANDWERMEYER: Have you ever solicited another to commit a homosexual act or act of sodomy?

MR. LOBSENZ: I raise all six objections that I raised to the very first question.

CAPTAIN LANDWERMEYER: Have you ever solicited another to commit a homosexual act or an act of sodomy during your present term of enlistment?

MR. LOBSENZ: I object on all six grounds as I mentioned previously.

CAPTAIN LANDWERMEYER: That completes the questions.

MR. LOBSENZ: I'd like to request that that list of questions be made an exhibit to accompany the court reporter's transcript, and I'd also like to request a copy of it? And, I would once again request an answer, this morning, if you don't have the authority to give an answer, you can get in touch with somebody who has the authority to give the answer, as to whether or not you require another application for reenlistment from Sergeant Watkins, or whether his currently pending one is sufficient?

CAPTAIN JOHNSON: Okay. As I said, I don't have the information to answer that question. I don't know the current status of his enlistment application, other than the fact that it was processed through the company level by the previous company commander.

MR. LOBSENZ: I have further questions that I would like to ask of Captain Landwermeyer. Obviously, you have the right to consult counsel as well. Who did you receive your orders from to conduct this questioning?

CAPTAIN JOHNSON: Well, at this point, I think again it is not appropriate to debate the legal issues. I think the issues have been—

MR. LOBSENZ: —You can certainly refuse to answer our questions the same as we refused to answer yours, but I think if that's what you are doing, I would like to have that response

on the record. Are you advising him not to answer that question?

CAPTAIN JOHNSON: I am advising him not to answer any questions and to terminate the interview, because of the fact that I don't think it's the proper forum to raise and discuss these legal issues at. The purpose of Captain Landwermeyer's interview, as we've previously discussed, has been completed. The purpose was to give him the opportunity to respond to those questions that relate to his qualifications for reenlistment in the Army.

MR. LOBSENZ: Okay. Is that the end of the interview then?

CAPTAIN LANDWERMEYER: You don't need a signature here?

CAPTAIN JOHNSON: No, we don't. If Sergeant Watkins desires to sign, but I think that he completed the DA Form 3881 by putting in his comment there.

CAPTAIN LANDWERMEYER: Okay. The session is terminated.

```
WITH THE OFFICE OF THE STAFF JUDGE ADVOCATE )
Headquarters, 9th Infantry Division, Fort      )   AFFIDAVIT
Lewis, WAshington 98433                        )
```

I, RONALD W. JOHNSTONE, 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, MSG, do hereby attest:

That I am a Court Reporter, previously sworn in accordance with Article 42, UCMJ (10 USC 842) and Paragraph 114d, Manual for Courts-Martial, United States, 1969 (Revised Edition).

That the foregoing proceedings are true and correct, as reflected by my original notes, taken at said time and place.

DATED _6 OCTOBER 1982_

_____
RONALD W. JOHNSTONE
MSG, USA
Court Reporter

SUBSCRIBED AND SWORN before me this 6th day of October 1982, at Fort Lewis, Washington.

_____